CAMPEAU GOODSELL SMITH, L.C.
SCOTT L. GOODSELL, #122223
WILLIAM J. HEALY, #146158
440 N. 1st Street, Suite 100
San Jose, California 95112
Telephone: (408) 295-9555
Facsimile: (408) 295-6606

ATTORNEYS FOR Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                             ) Case No. 13-53491
                                                   )
272 E SANTA CLARA GROCERY, LLC,                    ) CHAPTER 11
                                                   )
                    Debtor.                        ) **EX PARTE APPLICATION TO**
                                                   ) **EMPLOY BROKER/AGENT**
                                                   )
                                                   )
                                                   )
                                                   )
                                                   )
                                                   )
                                                   )

TO THE HONORABLE STEPHEN L. JOHNSON, UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, BOSTON PRIVATE BANK & TRUST COMPANY, and all other interested parties:

Debtor 272 E SANTA CLARA GROCERY, LLC, Debtor and Debtor-in-possession herein ("Debtor" or "Applicant") request authority to employ Paul Melnyk and Sperry Van Ness | SV Advisors ("Agent/Broker") to market and sell Debtor's real property, identified as 272 E Santa Clara Street, San Jose, California, Santa Clara County Assessor's Parcel Number 467-24-111 ("Property"), more fully described hereinafter, pursuant to Section 327 (a) of the Bankruptcy Code (the "Code") and Rule 2014 (a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") ("Application").

## I. Case Background/Status[1].

The following case background and status are presented in summary form to assist to the court with the Application but omit some background and disputed history not essential to the Application.

### A. May 2009 Loan to Kimomex.

In May 2009, several investors (collectively the "Investors") loaned $635,000 to Kimomex Santa Clara, LLC ("Kimomex") secured by a deed of trust in second position ("Second DOT") to Investment Grade Loans, Inc. ("IGL") as trustee against the Property. The Second DOT was subject to an existing first deed of trust in the amount of approximately $3.6 million dollars recorded in July 2008 in favor of Boston Private Bank & Trust Company ("BPB") (formerly known as Borel Private Bank & Trust Company) (the "First DOT"). The Property consisted of 1.4 acres improved with a commercial building of approximately 26,575 square feet originally built in 1966 which was occupied by tenant Kimomex Markets, Inc. which operated a Mexican grocery store business.

### B. July 2011 Foreclosure Agreement.

The Mexican grocery store business failed and Kimomex entered into protracted negotiations with a potential new grocery store tenant, i.e. Fresh & Easy, but that deal was never consummated. In March 2011 BPB recorded a notice of default under the First DOT and eventually set a trustee's sale for July 20, 2011.

Prior to the sale date, on July 15, 2011 BPB and IGL entered into an "Agreement Re Foreclosure Sale" (the "Foreclosure Agreement"). Under the Foreclosure Agreement BPB agreed that if IGL immediately paid $380,661.90 to cure the arrearage BPB would postpone the trustee's sale to after August 17, 2011, and that if IGL made "the regular monthly payment of $24,307.45 due under the Loan", then BPB would continuously postpone the trustee's sale through March 16, 2012.

---

[1] Debtor submits that the factual background stated herein is substantively and substantially undisputed except to note that BPB may disagree with portions not essential to the Application.

**EX PARTE APPLICATION TO EMPLOY BROKER/AGENT**
2

### C. October 2011 Foreclosure And Second DOT On Empty Building.

In June 2011 IGL recorded a notice of default under the Second DOT. The foreclosure took place on October 24, 2011. At the time of the sale, the unpaid balance was $1,183,908.74. At the sale, the Investors bid $100,000, which was the highest bid, and became the owners of the Property, leaving a deficiency balance due on the second loan of $1,083,908.74. At the time of the foreclosure, the building was empty, there was no tenant, and there was no rental income. Between October 2011 and March 2012, the Investors marketed the Property for lease to potential tenants, found a tenant in March 2012, and eventually paid $242,000 in leasing commissions. At the same time IGL was paying BPB $24,307.45 per month.

### D. First and Second Amendments to Foreclosure Agreement.

In November 2011 and January 2012, IGL and BPB entered into a "First Amendment" and a "Second Amendment to Agreement Re Foreclosure Sale" (the "Second Amendment"). Under the Second Amendment the parties agreed that if IGL made "the regular monthly payments" for December 2011 through March 2012 of $24,307.45 then BPB would postpone the foreclosure sale, and if the Investors wanted to pay off the First DOT, BPB would accept $3.25 million dollars, less the payments made for those months, in full satisfaction of the First DOT. The plan was to have the Property leased and sold by March 2012 in order to pay off the First DOT.

### E. March 2012-New Tenant and Third Amendment.

In March 2012, the Investors formed 272 E Santa Clara Grocery, LLC ("Debtor") and deeded their respective ownership interests in the Property to the Debtor. The deed was recorded in April 2012.

On or about March 8, 2012, Debtor, as landlord, entered into a 10-year lease for the Property with Grocery Outlet, Inc., a national grocery store chain. During the few years the tenant pays rent of $39,600 per month. The monthly rent is net of all expenses, including

property taxes, insurance, and maintenance (except the roof and structure) which are all paid by the tenant.

In March 2012, BPB, IGL, and Debtor entered into a "Third Amendment to Agreement Re Foreclosure Sale" (the "Third Amendment"). Under the Third Amendment, the parties agreed that if BPB was paid "the regular monthly payment of $24,307.45 due under the Loan" then BPB would postpone the trustee's sale through December 31, 2012. The parties further agreed that Plaintiff and Debtor would enter into a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") under which BPB would not disturb the tenant's possession in the event BPB foreclosed, which SNDA was signed on July 26, 2012.

In reliance upon the multiple agreements with BPB, Debtor continued to pay BPB $24,307.45 per month through and including March 2013. Thus, from July 2011 through March 2013, Debtor paid Plaintiff $380,661.90 to cure the arrearage, plus approximately $413,219 in monthly payments for a total of $793,880.90. This is in addition to the approximate $242,000 for leasing commissions spent to find a tenant. Thus, a total of approximately $1,033,880 has been spent in reliance upon the agreements with BPB.

**F. December 2012-Sale of Property and Debtor's Discovery of Environmental Contamination and BPB's Non-Disclosure.**

In November 2012, Debtor found a buyer and entered into a contract for the sale of the Property for $7.3 million dollars. The escrow was scheduled to close in December 2012. This sale would have paid off BPB's lien. However, during their due diligence, the buyer discovered that the Property was listed with the State and/or County as undergoing clean-up or investigation due to a possible leak from an old underground storage tank. Specifically, while conducting a Phase I, Environmental Investigation, the buyer discovered the existence of prior reports filed showing that the Property was contaminated. As a result of the discovery, the buyer cancelled the sale.

This discovery by the buyer was the first notice that Debtor had of any contamination on the Property. However, Debtor was informed that BPB had been aware of the contamination

since 2008, had a copy of a report showing purported contamination, and never disclosed the report or the purported contamination to Debtor. Had BPB disclosed this information to Debtor, Debtor would not have paid BPB $793,880 to cure the default, made payments under the First DOT, or invested another $242,000 in leasing commissions to find a tenant.

**G. May 2013-Proposed Fourth Amendment, Agreement to Suspend Payments, and Release of Claims.**

Debtor continued to make the monthly payments to BPB through March 2013. Around that time, BPB, IGL and Debtor negotiated the terms for a fourth amendment regarding the foreclosure sale. Under the terms as negotiated, Plaintiff agreed that so long as Debtor and IGL took certain steps to obtain a "closure and/or no further action letter" regarding the contamination from the required regulatory agency, and to the extent required, pay for any additional environmental investigation, testing, remediation and/or other work, kept BPB apprised of the progress, and obtained a "closure and/or no further action letter" resolving all environmental issues no later than April 30, 2014, then no monthly payments after March 2013 would be due, and the foreclosure sale would be continued through April 30, 2014.

In reliance upon the agreement that no payments were due after March 2013, Debtor did not make payments pending the drafting and execution of the fourth amendment. The draft fourth amendment was not received until May 2013. Consistent with the negotiations, the draft fourth amendment stated that no payments would be due after March 2013. However, contrary to prior discussions, the proposed "Fourth Amendment to Agreement Re Foreclosure Sale" (the "Fourth Amendment"), required Debtor, IGL, and their predecessors to release BPB from any claims relating to the Property including any environmental issues. As BPB had failed to disclose the environmental contamination to Debtor prior to and during its dealings and did not know the severity of the contamination and cost of remediation, Debtor refused to execute the Fourth Amendment.

**H. May 13, 2013-BPB Serves Demand on Tenant to Pay All Rents to BPB.**

On or about May 17, 2013 BPB served a "Demand That You Pay Rent To A Party Other Than The Landlord" on the tenant. Debtor received confirmation that the tenant would comply with the demand and pay all rents directly to BPB. In compliance with the demand and commencing June 2013, BPB received and continues to receive all the rent, i.e. $39,600, directly from the tenant (this rent is about $15,300 more than the monthly payment). Pre-petition Debtor tendered, and continued to tender, immediate payment of the total arrearage, thereby bringing the obligation current and reinstating the loan. BPB wrongfully rejected this tender.

**I. Bankruptcy.**

On June 27, 2013, Debtor commenced this Chapter 11 bankruptcy case ("Bankruptcy Case"). No Receiver or Trustee has been appointed, and the Debtor remains a Debtor in Possession pursuant to 11 U.S.C. under Chapter 11 of title 11, United States Code sections 1107 and 1108. The bankruptcy was filed to avoid the unnecessary and expensive appointment of a receiver, to prevent BPB's pending foreclosure, and protect Debtor's substantial investment and substantial equity.

On September 24, 2013, Debtor filed a disclosure statement and plan with a hearing date of November 7, 2013 (Doc#62). On October 7, 2013, the court issued an Order Denying Motion for Order Confirming No Stay with Respect to Rent and Denying Cross-Motion for Use of Cash Collateral (Doc#64). Debtor and BPB are discussing, among other things, BPB's turnover of post-petition rents and related cash collateral issues.

**J. Status of Environmental Issue.**

Debtor contracted with ERAS Environmental, Inc. ("ERAS") to assist Debtor address the environmental issues and secure government clearance so the Property can be sold. On August 26, 2013 the Santa Clara County Department of Environmental Health ("DEH") advised Debtor that based on their review it appeared that the Property qualified for closure under State Water Resource Control Board Low-Threat Underground Storage Tank Case

**EX PARTE APPLICATION TO EMPLOY BROKER/AGENT**
6
Case: 13-53491   Doc# 66   Filed: 10/11/13   Entered: 10/11/13 18:13:17   Page 6 of 8

Closure Policy ("LTCP"), no further action was required at that time, and the matter would proceed through the closure process before it was recommended for final closure.

**II.  Employment of Agent/Broker.**

Debtor has retained Agent/Broker to market and sell the Property and believes that such is in the best interests of the Debtor, the estate, and the creditors. Post-petition Debtor and Agent/Broker have continued to market the Property consistent with their pre-petition listing agreement. As Debtor believes it has addressed the environmental issues sufficient to proceed with a market rate sale it wishes to formalize its employment of Agent/Broker, market the Property for sale, sell the Property, compensate the Agent/Broker accordingly, and proceed to address the remaining issues. Therefore, Debtor requests authority to employ Agent/Broker in the marketing and sale of the Property.

**A. Agent/Broker.**

Sperry Van Ness | SV Advisors focus on serving tenants and owners of office, R&D, retail and industrial real estate in Silicon Valley and beyond and is structured to insure that each client enjoys a real estate solution that meets all of their business and/or investment goals.  The culture of teamwork and cooperation within its Silicon Valley team, as well as throughout Sperry Van Ness nationwide, insures that each of its advisors has the ability to leverage a tremendous pool of knowledge and expertise for the benefit of our clients.

Paul Melnyk (California Real Estate License #01270795) is a proven performer functioning as a "point person" for new ventures and a solution provider for established entities and private funds. Over the last thirty years, he has gained invaluable technical and business acumen that provides a strong foundation for analyzing clients' needs and executing favorable results. Prior to joining Sperry Van Ness | SV Advisors, he spent 6 years at Grubb & Ellis Company as Research Director, Portfolio Manager and Agent. In addition, he spent 5 years at Cassidy Turley focusing on investments, sales and leasing for private funds, high net-worth individuals as well as public and private companies. As discussed hereinabove, pre-petition Debtor employed Agent/Broker to secure the Property's current tenant and to market and sell the Property.

**B. Terms of Agreement.**

The terms of Debtor's employment of Broker/Agent are set forth in the Listing Agreement attached hereto as Exhibit A. In summary, the Listing Agreement provides that Broker/Agent receives a commission of 4% for the sale of the Property.

**B. Sale Proceeds.**

Debtor, subject to the specific terms of a purchase agreement and to set forth in Debtor's disclosure statement and plan and/or motion to sell, intends to pay, at closing, usual and customary closing costs, including escrow fees or costs and commissions; outstanding real property taxes; and BPB's principal and contract interest; and hold the balance of the funds in a DIP account, including funds to address claims by BPB for default interest, costs, and attorney's fees pending an agreement between Debtor and BPB regarding such disputed issues, an order from this court, confirmation, and/or dismissal of the case.

At this time Debtor anticipates that a sale of the Property will, after payment of usual and customary closing costs, outstanding real property taxes, and BPB's outstanding principal and contract interest, leave sufficient funds to satisfy the disputed claims of BPB, administrative claims, and unsecured claims and return monies to the Debtor for distribution to its members.

**III. Conclusion.**

WHEREFORE, Applicant respectfully requests that it be authorized to employ Agent/Broker on the terms and conditions set forth in this Application or incorporated herein.

Dated: October 10, 2013  CAMPEAU GOODSELL SMITH
　　　　　　　　　　　　　／s/ William J. Healy
　　　　　　　　　　　　　William J. Healy