# Exhibit 3

```
              UNITED STATES BANKRUPTCY COURT

              NORTHERN DISTRICT OF CALIFORNIA




In re 272 E. Santa Clara
Grocery, LLC,                    CASE NO. 13-53491
                                 Chapter 11
          Debtor.
_____/


              DEPOSITION OF ANDREW LEWIS



DATE:         September 18, 2013

TIME:         9:40 a.m.

LOCATION:     HOPKINS & CARLEY
              70 S. First Street
              San Jose, CA 95113


REPORTED BY:  KAREN L. BUCHANAN
              CSR No. 10772
              CLR No. 031106-04
```

1

Case: 13-53491   Doc# 106-7   Filed: 12/04/13   Entered: 12/04/13 11:26:15   Page 2 of 13

|    |    |    |
|---|---|---|
| 1  | MR. HEALY: Who is that video camera | 09:41:59 |
| 2  | looking at right now? | 09:42:02 |
| 3  | THE WITNESS: Me. | 09:42:05 |
| 4  | MR. HEALY: At the witness? Before we | 09:42:06 |
| 5  | commence, I want to make an objection for the | 09:42:09 |
| 6  | record. Tell me when you think it's appropriate. | 09:42:12 |
| 7  | THE VIDEOGRAPHER: Would the Court Reporter | 09:42:15 |
| 8  | please swear in the witness. | 09:42:17 |
| 9  | ANDREW LEWIS, | 09:42:17 |
| 10 | being duly sworn by the Certified Shorthand Reporter | 09:42:17 |
| 11 | to tell the truth, the whole truth, and nothing but | 09:42:17 |
| 12 | the truth, testified as follows: | 09:42:17 |
| 13 | MR. KOTTMEIER: Okay. | 09:42:27 |
| 14 | MR. HEALY: I'm going to go ahead and make | 09:42:28 |
| 15 | an objection here that there was nothing to my | 09:42:30 |
| 16 | knowledge in my review of the application and the | 09:42:32 |
| 17 | order referencing a videotape of this examination. | 09:42:34 |
| 18 | And I believe under both the Federal rules and the | 09:42:39 |
| 19 | California rules that that is required. So we're | 09:42:43 |
| 20 | going to sit here, but with the videotape on, but we | 09:42:46 |
| 21 | reserve the right to walk out because of videotape. | 09:42:50 |
| 22 | THE WITNESS: We can walk out now. | 09:42:54 |
| 23 | MR. HEALY: When I ask you a question and | 09:42:56 |
| 24 | he asks you a question, you can answer. Otherwise, | 09:42:59 |
| 25 | be quiet. | 09:43:01 |

6

| | | |
|---|---|---|
| 1 | Q. Did you -- as of May of 2009, did you have | 11:33:59 |
| 2 | any standard practices that you used to evaluate a | 11:34:02 |
| 3 | potential loan? | 11:34:08 |
| 4 | A. Generally speaking, we got some type of | 11:34:09 |
| 5 | application. We found out what the property was, | 11:34:14 |
| 6 | and we had to get a feel for what the value was, and | 11:34:17 |
| 7 | then we have to generally get an understanding for | 11:34:21 |
| 8 | what the money was used for or going to be used for | 11:34:24 |
| 9 | and how we were going to be paid on a monthly basis | 11:34:28 |
| 10 | until the loan was paid back. So it was just | 11:34:33 |
| 11 | general underwriting that would be done even by a | 11:34:36 |
| 12 | bank. But a bank's underwriting procedure is much | 11:34:40 |
| 13 | more rigorous than ours. | 11:34:45 |
| 14 | But in the hard money business, we have | 11:34:48 |
| 15 | done loans in as little as three days and things of | 11:34:51 |
| 16 | that sort. We can respond much quicker to | 11:34:54 |
| 17 | opportunities and therefore command a higher | 11:34:58 |
| 18 | interest rate. | 11:35:02 |
| 19 | Q. With respect to valuation determinations, | 11:35:03 |
| 20 | did you have any standard practice or procedure that | 11:35:06 |
| 21 | you used to try to value the potential collateral? | 11:35:08 |
| 22 | A. The word "standard practice" doesn't really | 11:35:14 |
| 23 | compute with me. I had to evaluate based on my | 11:35:18 |
| 24 | expertise and my knowledge of the market to get | 11:35:21 |
| 25 | comfortable in a valuation. So that would include | 11:35:24 |

83

| | | |
|---|---|---|
| 1 | things like appraisals, again, knowledge of the | 11:35:27 |
| 2 | market, how unusual the type of property was.  And | 11:35:31 |
| 3 | if I could get comfortable with the valuations that | 11:35:36 |
| 4 | were being made by the borrower and his demands were | 11:35:40 |
| 5 | within what we would consider a regional lending | 11:35:44 |
| 6 | range, which I could describe to you, but then we | 11:35:48 |
| 7 | did the deal. | 11:35:51 |
| 8 |     Q.  When you say "reasonable lending range," | 11:35:53 |
| 9 | what do you mean by that? | 11:35:55 |
| 10 |     A.  We have different lending ranges, loan to | 11:35:56 |
| 11 | values, based on the type of asset, differing like | 11:36:00 |
| 12 | land versus commercial property; lease versus | 11:36:08 |
| 13 | unleased; owner occupied, nonowner occupied, | 11:36:13 |
| 14 | et cetera and so forth. | 11:36:17 |
| 15 |     Q.  Did you have any practice or procedure with | 11:36:19 |
| 16 | respect to getting information on environmental | 11:36:20 |
| 17 | issues for potential collateral? | 11:36:23 |
| 18 |     A.  Yes.  It depends on the situation.  I mean | 11:36:26 |
| 19 | as it pertains to this property, which I think would | 11:36:29 |
| 20 | be an answer you'd like, we didn't feel like we | 11:36:33 |
| 21 | needed any environmental information, because it had | 11:36:37 |
| 22 | always been a grocery store, to the best of our | 11:36:40 |
| 23 | knowledge.  And it was in the middle of downtown | 11:36:42 |
| 24 | San Jose, and there had been a lot of transactions | 11:36:44 |
| 25 | recorded and done regarding the property.  Plus our | 11:36:47 |

84

|  |  |  |
|---|---|---|
| 1 | borrower told us in no uncertain terms that the | 11:36:53 |
| 2 | property was clean. | 11:36:57 |
| 3 | Q. Who was -- | 11:36:57 |
| 4 | A. So -- | 11:37:00 |
| 5 | Q. Go ahead. | 11:37:01 |
| 6 | A. -- and finally, within a relatively short | 11:37:02 |
| 7 | time, we saw an institutional lender doing a loan on | 11:37:07 |
| 8 | the property. And we know the rigorous -- the | 11:37:11 |
| 9 | generally rigorous underwriting procedures that they | 11:37:15 |
| 10 | take, and we often dovetail off that information to | 11:37:19 |
| 11 | do our loans. | 11:37:24 |
| 12 | Q. The institutional lender you're speaking of | 11:37:24 |
| 13 | here is Borel? | 11:37:29 |
| 14 | A. Borel. | 11:37:30 |
| 15 | Q. What is -- when you say you dovetail off | 11:37:30 |
| 16 | what the institutional lender does, what do you mean | 11:37:33 |
| 17 | by that? | 11:37:37 |
| 18 | A. For example, we accepted the appraisal. We | 11:37:38 |
| 19 | didn't do an additional appraisal. We didn't feel | 11:37:40 |
| 20 | an additional appraisal was necessary, given the | 11:37:42 |
| 21 | fact that the appraisal I believe was in '09, and we | 11:37:46 |
| 22 | were a couple of years later. And things had not | 11:37:49 |
| 23 | gotten worse, they had gotten better. So we made | 11:37:52 |
| 24 | the assumption, based on our knowledge of that | 11:37:54 |
| 25 | appraiser and our knowledge of the market, which is | 11:37:57 |

85

| | | |
|---|---|---|
| 1 | a local market, that if anything, the property value | 11:38:00 |
| 2 | would have been higher than what was on that piece | 11:38:02 |
| 3 | of paper, not lower. | 11:38:05 |
| 4 | And the appraisal, to the best of my | 11:38:08 |
| 5 | knowledge, was clean, plus the investor said it was | 11:38:10 |
| 6 | clean. | 11:38:14 |
| 7 | Q. When you say "clean," you mean that there | 11:38:17 |
| 8 | were no environmental issues with respect to the | 11:38:19 |
| 9 | property? | 11:38:21 |
| 10 | A. Yes. | 11:38:21 |
| 11 | Q. Who was -- who was it that -- at the | 11:38:21 |
| 12 | borrower who told you that the property was clean? | 11:38:27 |
| 13 | A. I can't answer for sure, but I will say it | 11:38:29 |
| 14 | was either David or Kimball Small. It was one of | 11:38:35 |
| 15 | those two. | 11:38:38 |
| 16 | Q. And was it -- were you the person who was | 11:38:38 |
| 17 | the recipient of that information personally? | 11:38:41 |
| 18 | A. Yes. | 11:38:44 |
| 19 | Q. And was that in conversation, or was that | 11:38:44 |
| 20 | by writing? | 11:38:47 |
| 21 | A. Conversation. | 11:38:47 |
| 22 | Q. How did the subject come up between you and | 11:38:48 |
| 23 | whichever of the Smalls it was that had the | 11:38:57 |
| 24 | conversation with you? | 11:38:59 |
| 25 | A. I don't remember. | 11:39:00 |

86

| | | |
|---|---|---|
| 1 | Q. Was it your practice to ask a potential | 11:39:01 |
| 2 | borrower? | 11:39:05 |
| 3 | A. Yes. | 11:39:07 |
| 4 | Q. What generally would you ask a potential | 11:39:07 |
| 5 | borrower on the subject of environmental? | 11:39:12 |
| 6 | A. "Is there any environmental problems?" | 11:39:14 |
| 7 | Q. That's typically your question, just simple | 11:39:16 |
| 8 | as that? | 11:39:20 |
| 9 | A. Simple as that. | 11:39:21 |
| 10 | Q. And did you ever -- | 11:39:22 |
| 11 | A. And the appraisal, for what it's worth, | 11:39:23 |
| 12 | didn't show anything and didn't say anything, to the | 11:39:26 |
| 13 | best of my memory. I wish we had it here, but I | 11:39:29 |
| 14 | don't have it here. | 11:39:32 |
| 15 | And often -- I'll add, often in situations, | 11:39:35 |
| 16 | if there is a known problem, that would be in the | 11:39:39 |
| 17 | appraisal. | 11:39:44 |
| 18 | Q. Did you -- with respect to the loan that | 11:39:45 |
| 19 | was made to Kimomex Santa Clara, did you ask anybody | 11:39:50 |
| 20 | if there was a Phase I or a Phase II done on the | 11:39:55 |
| 21 | property? | 11:40:00 |
| 22 | A. I don't recall. I might have asked. I | 11:40:00 |
| 23 | don't recall. | 11:40:03 |
| 24 | Q. Do you know what a Phase I is? Do you have | 11:40:05 |
| 25 | an understanding what that is? | 11:40:07 |

87

| | | |
|---|---|---|
| 1 | A. Yes. | 11:40:09 |
| 2 | Q. Did you have an understanding in May of | 11:40:09 |
| 3 | 2009 what that was? | 11:40:11 |
| 4 | A. Yes. | 11:40:12 |
| 5 | Q. In connection with any loans that | 11:40:12 |
| 6 | Investment Grade Loans made prior to that time, had | 11:40:16 |
| 7 | you ever asked for a Phase I to be provided to you? | 11:40:19 |
| 8 | A. Yes. | 11:40:22 |
| 9 | Q. And did you consider doing that on this | 11:40:22 |
| 10 | particular property? | 11:40:25 |
| 11 | A. No. | 11:40:28 |
| 12 | Q. Why not? | 11:40:29 |
| 13 | A. Because we just saw on institutional loan | 11:40:29 |
| 14 | put on it. And like I explained to you, in the | 11:40:33 |
| 15 | effort of time and cost, we figured we were okay. | 11:40:36 |
| 16 | Q. Did you discuss the making of the loan to | 11:40:45 |
| 17 | Kimomex Santa Clara with anybody who was one of your | 11:40:47 |
| 18 | employees with Investment Grade Loans? | 11:40:51 |
| 19 | A. Yes. I don't remember any detail of | 11:40:54 |
| 20 | discussion, but I would imagine I did, but I can't | 11:41:02 |
| 21 | give you -- | 11:41:04 |
| 22 | Q. Did you involve anybody in Investment Grade | 11:41:04 |
| 23 | Loans in the decision-making process when deciding | 11:41:09 |
| 24 | whether to make the loan or not? | 11:41:11 |
| 25 | A. No. I mean I might get inputs if they have | 11:41:13 |

|   |   |   |
|---|---|---|
| 1 | something to say, and those two people would be Alan | 11:41:17 |
| 2 | and Tom. | 11:41:21 |
| 3 | Q. Rancatore and Arndt? | 11:41:21 |
| 4 | A. Correct. And so I would have gotten inputs | 11:41:24 |
| 5 | from them if they knew something that they thought | 11:41:26 |
| 6 | was pertinent and valuable material. But -- | 11:41:28 |
| 7 | Q. Go ahead. I'm sorry. | 11:41:31 |
| 8 | A. -- my job is to do the underwriting and to | 11:41:32 |
| 9 | solicit -- to, you know, get the investors and fund | 11:41:35 |
| 10 | the loan. Their predominant job is to handle the | 11:41:40 |
| 11 | management after it's completed. | 11:41:46 |
| 12 | Q. You mean after the loan is made and in | 11:41:50 |
| 13 | place? | 11:41:52 |
| 14 | A. That's correct. | 11:41:53 |
| 15 | Q. Essentially the servicing part of the loan? | 11:41:53 |
| 16 | A. Yes. | 11:41:59 |
| 17 | Q. With respect to the loan that was made to | 11:41:59 |
| 18 | the Santa -- excuse me, Kimomex Santa Clara, LLC, | 11:42:05 |
| 19 | you got into this a little bit earlier, but I want | 11:42:11 |
| 20 | to make sure I understand it. How did that loan | 11:42:13 |
| 21 | come about? | 11:42:16 |
| 22 | A. I don't remember how we got the lead, | 11:42:17 |
| 23 | whether we got it from Borel Bank, who we had | 11:42:19 |
| 24 | relations with, or whether it came through another | 11:42:23 |
| 25 | source. So I don't remember how we got the lead. | 11:42:26 |

89

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500
Case: 13-53491   Doc# 106-7   Filed: 12/04/13   Entered: 12/04/13 11:26:15   Page 10 of 13

1  Norm Hulberg. I thought it was Norm Hulberg. It's           11:50:17
2  his company, but we also know Steve Kuhnhoff, too.           11:50:21
3      Q. Did you speak to Norm or did you speak to             11:50:29
4  Steve with respect to --                                      11:50:32
5      A. Probably Norm. Maybe Steve.                            11:50:34
6      Q. Do you know him?                                       11:50:37
7      A. Yes. I know them both.                                 11:50:37
8      Q. Was there anything else that you can recall           11:51:11
9  that you did with respect to investigation of the            11:51:13
10 potential loan to Kimomex Santa Clara as part of             11:51:17
11 your underwriting prior to making the loan?                  11:51:21
12     A. Restate: Went to the physical property;               11:51:24
13 talked to the physical owner; talked about their             11:51:33
14 business; looked at other properties that he had             11:51:37
15 available that he wanted us to lend on. I remember           11:51:40
16 going to some others and not wanting to take them.           11:51:42
17 Discussion with the appraiser; noticing also that an         11:51:48
18 institutional lender that we do business with also           11:51:53
19 had just done a loan on it, and we know that we had          11:51:56
20 done loans with Borel Bank, so we know their                 11:51:59
21 underwriting procedures.                                     11:52:02
22     Q. When you said you had done loans, is that             11:52:03
23 as a borrower you had done loans?                            11:52:05
24     A. That is correct.                                      11:52:07
25     Q. When was the first time you had contact               11:52:18

96

| | | |
|---|---|---|
| 1 | with anybody at Borel regarding the 272 East Santa | 11:52:20 |
| 2 | Clara Street property or the loan that Borel had | 11:52:28 |
| 3 | made on that property? | 11:52:31 |
| 4 |     A.  I don't know.  I'm going to guess -- would | 11:52:32 |
| 5 | you like me to -- | 11:52:37 |
| 6 |     Q.  The best -- | 11:52:38 |
| 7 |     MR. HEALY:  You woke me up.  Don't guess, | 11:52:39 |
| 8 | but give him the best answer you can. | 11:52:41 |
| 9 |     THE WITNESS:  2011 is the best answer I can | 11:52:43 |
| 10 | think of. | 11:52:45 |
| 11 | BY MR. KOTTMEIER: | 11:52:45 |
| 12 |     Q.  And what was it, what were the | 11:52:46 |
| 13 | circumstances that caused you to first have contact | 11:52:47 |
| 14 | with somebody at Borel? | 11:52:50 |
| 15 |     A.  He was getting foreclosed out by Borel. | 11:52:52 |
| 16 |     Q.  And how did -- "he" being? | 11:52:55 |
| 17 |     A.  Small. | 11:52:56 |
| 18 |     Q.  Small.  And how did you learn that there | 11:52:57 |
| 19 | was a foreclosure that Borel had instituted? | 11:53:00 |
| 20 |     A.  I think we got notification from Borel as a | 11:53:04 |
| 21 | junior lender. | 11:53:07 |
| 22 |     Q.  So you get the typical notice of elections? | 11:53:08 |
| 23 |     A.  Notice of default, notice of sale. | 11:53:10 |
| 24 |     Q.  Okay. | 11:53:13 |
| 25 |     MR. HEALY:  Excuse me.  Please let him | 11:53:13 |

1                          CERTIFICATE

2

3.

4      I, KAREN L. BUCHANAN, CSR #10772, do hereby

5  certify:

6      That prior to being examined, the witness

7  named in the foregoing deposition was by me duly

8  sworn to testify to the truth, the whole truth, and

9  nothing but the truth;

10     That said deposition was taken down by me in

11 shorthand at the time and place therein named, and

12 thereafter reduced to typewriting under my

13 direction.

14     I further certify that I am not interested in

15 the outcome of the action.

16     Witness my hand this 1st day of October,

17 2013.

18

19

20                      _____

21                      KAREN L. BUCHANAN

22                      CSR No. 10772

23                      CLR No. 031106-04

24

25

                                                    179