1  CAMPEAU GOODSELL SMITH, L.C.
   SCOTT L. GOODSELL, #122223
2  WILLIAM J. HEALY, #146158
   440 N. 1st Street, Suite 100
3  San Jose, California  95112
   Telephone:  (408) 295-9555
4  Facsimile:  (408) 295-6606

5  ATTORNEYS FOR Debtor

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11 In re:                          )  Case No. 13-53491
                                   )
12 272 E SANTA CLARA GROCERY, LLC, )  CHAPTER 11
                                   )
13                      Debtor.     )  **AMENDED OBJECTION TO PROOF**
                                   )  **OF CLAIM OF BOSTON PRIVATE**
14                                  )  **BANK & TRUST COMPANY**
                                   )  **(Claim No. 2)**
15                                  )
                                   )
16                                  )
                                   )
17                                  )
   _____)
18

19 TO THE HONORABLE STEPHEN L. JOHNSON, UNITED STATES BANKRUPTCY

   COURT JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; BOSTON
20
   PRIVATE BANK & TRUST COMPANY; and all other interested parties:
21
          COMES NOW, Debtor 272 E. Santa Clara Grocery, LLC ("Debtor") and objects to
22
   Boston Private Bank & Trust Company's, a successor of interest to Borel Private Bank and
23
   Trust Company ("BPB"), Proof of Claim No. 2 filed October 22, 2013 ("BPB Claim") as
24
   follows ("Objection")[1]:
25

26

27
   _____
28 [1]This objection amends the Objection filed on October 28, 2013 (Docket#88).

Case: 13-53491   Doc# 119   Filed: 12/13/13   Entered: 12/13/13 16:45:12   Page 1 of 34

# TABLE OF CONTENTS

Page(s)[2]

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

INTRODUCTION AND SUMMARY OF OBJECTION . . . . . . . . . . . . . . . . . . . . . . . . 6

CASE BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

DEBTOR OBJECTS TO THE BPB CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    BPB'S Principal Claim Is Overstated and Contradicts Previous Sworn Statements Relative to the Outstanding Principal Due . . . . . . . . . . . . . . . . . . 15

    B.    BPB's Purported Calculation of Interest Is Also Overstated Because Its Principal Claim Is Overstated, It Contradicts Previous Sworn Statements Relative to the Outstanding Principal Due, It Is Miscalculated, and It Neglects to Account for Debtor's November 8, 2013 Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    C.    BPB's Entire Claim Was Admittedly Backdated . . . . . . . . . . . . . . . . . . . . . . 18

    D.    BPB Has Improperly Asserted Default Interest Against the Debtor and Improperly Backdated the Alleged Default Date . . . . . . . . . . . . . . . . . . . . . . 18

    E.    The BPB Claim Improperly Includes Late Fees Notwithstanding Debtor Cured BPB's Claimed Monetary Defaults and Caused Timely Monthly Payments to Be Made Thereafter and Through Present . . . . . . . . . . . . . . . . . . 19

    F.    BPB Is Not Entitled to Attorney's Fees or Costs From Debtor Because They Are Not Included in The BPB Claim, Debtor Is Not BPB's Borrower, Debtor Has Been the Prevailing Party on All Actions Asserted by BPB, and BPB's Attorney's Fees Were Not Reasonable or Necessary . . . . . . . . . . . . . . . . . .. . . 21

    G.    Debtor Has Multiple Claims Against the BPB Claim . . . . . . . . . . . . . . . . . . . 22

    H.    BPB Waived Any Right to Belatedly Backdate Debtor's Payments and Charge Default Interest and Late Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    I.    BPB Must Be Estopped From Belatedly Backdating Debtor's Payments and Charging Default Interest and Late Fees . . . . . . . . . . . . . . . . . . . . . . . . . 27

    J.    BPB Is Not Entitled to Default Interest Or Late Fees Under Applicable Nonbankruptcy Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    K.    BPB's Claims For Backdated Principal, Default Interest, and Late Fees Are Barred by The Doctrine of Judicial Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    L.    Additional Nonbankruptcy Law Precludes Enforcement of BPB's Belated Claims

---

[2]Debtor apologizes for unanticipated technical difficulties relating to page numbering.

for Default Interest and Late Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

M.  Breach of Duty of Good Faith and Fair Dealing Bars BPB's Attempt to Belatedly
    Backdate Debtor's Payments and Charge Default Interest and Late Fees . . . . . . . . . .33

N.  BPB Is Not Entitled To Backdated Default Interest and Late Fees . . . . . . . . . . . . . . 34

O.  Debtor Reserves the Right to Amend or Supplement this Objection . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 3 of
34

**<u>TABLE OF AUTHORITIES</u>**

<u>CASES</u>

Beal Bank v. Crystal Props., LTD. (In re Crystal Props., LTD.),   268 F.3d 743, 747-748 (9th Cir. Cal. 2001)

Chodus v. West Publishing Co., 292 F.3d 992, 1002 (9th Cir. 2002)

Darling Int'l, Inc. v. Baywood Partners, Inc., 2007 U.S. Dist. LEXIS 50985 (N.D. Cal. July 13, 2007)

Dean Witter Reynolds v. Superior Court, 211 Cal.App. 3d 758 (Cal. App. 1st Dist. 1989)

Del Hur, Inc. v. Nat'l Union Fire Ins. Co., 94 F.3d 548 (9th Cir. 1996)

Donicker Corp. v. Pittsburgh Nat'l Bank, 1994 U.S. App. LEXIS 31528 (9th Cir. Guam Nov. 9, 1994)

Edwards v. Aetna Life Ins. Co., 690 F.2d 595 (6th Cir. 1982)

Garcia v. World Savings, FSB, 183 Cal. App. 4th 1031, 1045 (Cal. App. 2d Dist. 2010)

Garrett v. Coast & Southern Sav. & Loan Ass'n (1973) 9 Cal.3d 731

General Electric Capital Corp. v. Future Media Productions, Inc., 536 F.3d 969 (9th Cir. 2008)

Harbor Island Holdings v. Kim, 107 Cal.App.4th 790 (Cal.App.4th Dist. 2003)

Harper v. Ultimo, 113 Cal. App. 4th 1402 (Cal. App. 4th Dist. 2003)

Howard J. White, Inc. v. Varian Associates, 178 Cal.App. 2d 348 (Cal. App. 1st Dist. 1960)

In re Charles St. African Methodist Episcopal Church of Boston ("CSAME"), 2012 Bankr. LEXIS 4321 (Bankr. D. Mass. Sept. 18, 2012)

In re Cliftondale Oaks, LLC, 357 B.R. 883, 887 (Bankr. N.D. Ga. 2006)

In re Consolidated Properties Ltd. Partnership, 152 B.R. 452 (Bankr. D. Md.1993)

In re Harvest Oaks Drive Assocs., LLC, 2011 Bankr. LEXIS 146 (Bankr. E.D.N.C. Jan. 14, 2011)

In re Hoopai, 581 F.3d 1090 (9th Cir. 2009)

In re Kalian, 178 B.R. 308, 312 n. 9 (Bankr. D.R.I. 1995)

In re Market Center East Retail Property, Inc.,433 B.R. 335 (Bankr. D.N.M. 2010)

In re Sweet, 369 B.R. 644 (Bankr. D. Colo. 2007)

In re VEC Farms, LLC, 395 B.R. 674 (Bankr. N.D. Cal. 2008)

400 Walnut Assocs., L.P. v. 4th Walnut Assocs., L.P., (In re 400 Walnut Assocs., L.P.), 461 B.R. 308, 314 (Bankr. E.D. Pa. 2011)

In re Zamani, 390 B.R. 680, 2008 Bankr. LEXIS 1923

Knarston v. Manhattan Life Ins. Co. (1903) 140 Cal. 57

Lona v. Citibank, N.A., 202 Cal. App. 4th 89 (Cal. App. 6th Dist. 2011)

Mitsui Mfrs. Bank  v. Superior Court, 212 Cal. App. 3d 726 (Cal. App. 4th Dist. 1989)

New Hampshire v. Maine, 532 U.S. 742  (2001)

Ridgley v. Topa Thrift & Loan Ass'n, 17 Cal.4th 970 (Cal. 1998)

Rubin v. L.A. Fe. Sav. & Loan Ass'n (1984) 159 Cal.App.3d 292

Sutherland v. Barclays American/Mortgage Corp., 53 Cal. App. 4th 299 (Cal. App. 2d Dist. 1997)

United States v. Ibrahim, 522 F.3d 1003 (9th Cir.2008)

Varela v. Wells Fargo Bank, 15 Cal. App. 3d 741 (Cal. App. 3d Dist.1971)

Whaley v. Belleque, 520 F.3d 997 (9th Cir.2008)

**STATUTES AND RULES**

California Civil Code Section 1671

Restat 2d of Contracts, § 90, 208

Restat 2d of Contracts, § 208

11 USC §362

11 USC §506

## I. Introduction and Summary of Objection.

Debtor objects to the BPB Claim because after 2 1/4 years of negotiations with Debtor, agreements with Debtor, representations to Debtor, court filings in state court, court filings in this Bankruptcy Case, payments from Debtor of approximately $912,680.90, and notice of a sale of Debtor's real property BPB suddenly attempted to backdate Debtor's 2 1/4 years of payments, assert an additional $214,151.35 in principal, belatedly assert default interest and late fees, and bonus itself an additional $465,643.30 (the difference between the figure stated in the BPB Claim and the $3,341,017.00 paid to BPB on November 8, 2013 following the sale of Debtor's real property) and then add attorney's fees to that bonus, many of which does not relate to its note and deed of trust and were not reasonable or necessary. Debtor asserts, inter alia and as set forth hereinafter, that Debtor cured the note in July 2011 pursuant to Debtor's agreement with BPB and Debtor kept the loan current by paying BPB its regular monthly payment pursuant to its agreement with BPB, BPB does not have any right to backdate Debtor's 2 1/4 years of payments or charge late fees and default interest, and any alleged right to backdate Debtor's payments and charge default interest and late fees was waived, is unenforceable, is barred by equitable estoppel, the equities of the case, and judicial estoppel.

## II. Case Background/Status.

The following case background and status are presented in summary form to assist the court with the Objection and Debtor submits that the factual background stated herein is substantively and substantially undisputed, subject to judicial notice, and supported by the only person with person knowledge, namely Debtor's Responsible Individual Andrew A. Lewis.

### A. May 2009 Loan to Kimomex.

In May 2009, several investors (collectively the "Investors") loaned $635,000 to Kimomex Santa Clara, LLC ("Kimomex") secured by a deed of trust in second position ("Second DOT") to Investment Grade Loans, Inc. ("IGL") as trustee against the Property. The Second DOT was subject to an existing first deed of trust in the amount of approximately $3.6 million dollars recorded in July 2008 in favor of Boston Private Bank & Trust Company ("BPB") (formerly known as Borel Private Bank & Trust Company) (the

"First DOT"). The Property consisted of 1.4 acres improved with a commercial building of approximately 26,575 square feet originally built in 1966 which was occupied by tenant Kimomex Markets, Inc. which operated a Mexican grocery store business.

**B. July 2011 Foreclosure Agreement.**

The Mexican grocery store business failed and Kimomex entered into protracted negotiations with a potential new grocery store tenant, i.e. Fresh & Easy, but that deal was never consummated. In March 2011 BPB recorded a notice of default under the First DOT and eventually set a trustee's sale for July 20, 2011.

On July 15, 2011, prior to the sale date, BPB and IGL entered into an "Agreement Re Foreclosure Sale" (the "Foreclosure Agreement"). Under the Foreclosure Agreement BPB agreed that if IGL immediately paid $380,661.90 to cure the arrearage BPB would postpone the trustee's sale to after August 17, 2011, and that if IGL made "the regular monthly payment of $24,307.45 due under the Loan" to keep the loan current, then BPB would continuously postpone the trustee's sale through March 16, 2012. The Foreclosure Agreement also provided that the $380,661.90 sum shall be applied to payments of principal and interest now due, together with certain trustee's fees, attorneys' fees and other costs owing to Borel as of the date of this Agreement . . ." On July 18, 2001, pursuant to the Foreclosure Agreement, IGL paid BPB $380,661.90 to reinstate and bring the loan current. The Foreclosure Agreement acknowledges the Second DOT and at all times related to the Foreclosure Agreement and thereafter BPB was aware of the Second DOT.

On June 30, 2011, prior to the Foreclosure Agreement, BPB's agent PLM Lender Services, Inc. ("PLM") provided IGL with a reinstatement letter dated June 29, 2011 which indicated, in part, the amounts necessary to reinstate the loan through July 15, 2011 and specified a principal balance of $3,487,501.16. Exhibit A to Declaration of Andrew A. Lewis). Debtor negotiated the reinstatement and cure amount of $380,661.90 directly with Bruce Brown of BPB and based those negotiations and many factors, including the asserted principal balance of $3,487,501.16, that the regular monthly was $24,307.45, that the regular

monthly payment consisted of principal and interest at 6.5%, that the regular monthly payment of $24,307.45 would keep the loan current, and without knowledge of any environmental issues with the Property. IGL would not have foreclosed on its Second DOT, entered into the Foreclosure Agreement on behalf of IGL, paid the agreed reinstatement and cure monies of $380,661.90 or paid the regular monthly payments of $24,307.45 to keep the loan current had the principal balance not been $3,487,501.16, had the payment of $380,661.90 and the regular monthly payment of $24,307.45 not reinstated, cured, and kept the loan current, had the regular monthly payments of $24,307.45 not been based on interest at 6.5% and been applied to both principal and interest, had I been advised by BPB of the environmental issues with the Property, and had I been advised by BPB that it may attempt to assert any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs.

**C. October 2011 Foreclosure And Second DOT On Empty Building.**

In June 2011 IGL recorded a notice of default under the Second DOT. The foreclosure took place on October 24, 2011. At the time of the sale, the unpaid balance was $1,183,908.74. At the sale, the Investors bid $100,000, which was the highest bid, and became the owners of the Property, leaving a deficiency balance due on the second loan of $1,083,908.74. At the time of the foreclosure, the building was empty, there was no tenant, and there was no rental income. BPB was promptly made aware of the foreclosure on the Second DOT.

Between October 2011 and March 2012, the Investors marketed the Property for lease to potential tenants, found a tenant in March 2012, and eventually paid $242,000 in leasing commissions. At the same time IGL was paying BPB its regularly monthly payment of $24,307.45 per month to keep the loan current.

**D. First and Second Amendments to Foreclosure Agreement.**

In November 2011 and January 2012, IGL and BPB entered into a "First Amendment"

and a "Second Amendment to Agreement Re Foreclosure Sale" (the "Second Amendment"). Under the Second Amendment the parties agreed that if IGL made "the regular monthly payments" for December 2011 through March 2012 of $24,307.45 to keep the loan current then BPB would postpone the foreclosure sale, and if the Investors wanted to pay off the First DOT, BPB would accept $3.25 million dollars, less the payments made for those months, in full satisfaction of the First DOT. The plan was to have the Property leased and sold by March 2012 in order to pay off the First DOT. I negotiated these amendments directly with Bruce Brown of BPB.

**E. March 2012-New Tenant and Third Amendment.**

In March 2012, the Investors formed 272 E Santa Clara Grocery, LLC ("Debtor") and deeded their respective ownership interests in the Property to the Debtor. The deed was recorded in April 2012. BPB was promptly made aware of the transfer of such interest to the Debtor (and such is reflected in the Fourth Amendment discussed hereinafter).

On or about March 8, 2012, Debtor, as landlord, entered into a 10-year lease for the Property with Grocery Outlet, Inc., a national grocery store chain. During the first few years the tenant pays rent of $39,600 per month. The monthly rent was net of all expenses, including property taxes, insurance, and maintenance (except the roof and structure) which are all paid by the tenant.

In March 2012, BPB, IGL, and Debtor entered into a "Third Amendment to Agreement Re Foreclosure Sale" (the "Third Amendment"). Under the Third Amendment, the parties agreed that if BPB was paid "the regular monthly payment of $24,307.45 due under the Loan" to keep the loan current then BPB would postpone the trustee's sale through December 31, 2012. The parties further agreed that Plaintiff and Debtor would enter into a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") under which BPB would not disturb the tenant's possession in the event BPB foreclosed, which SNDA was signed on July 26, 2012. The Third Amendment was negotiated with Bruce Brown on behalf of BPB.

In reliance upon the multiple agreements with BPB, Debtor continued to pay BPB $24,307.45 per month through and including March 2013 to keep the loan current. Thus, from July 2011 through March 2013, Debtor paid Plaintiff $380,661.90 to cure the arrearage and bring the loan current, plus approximately $413,219 in monthly payments for a total of $793,880.90 to keep the loan current. This is in addition to the approximate $242,000 for leasing commissions spent to find a tenant. Thus, a total of approximately $1,033,880 was spent in reliance upon the agreements with BPB.

The Third Amendment indicated a principal balance on the loan of $3,460,917.00.

IGL and Debtor would not have foreclosed on its Second DOT, entered into the Foreclosure Agreement or subsequent amendments, paid the agreed reinstatement and cure monies of $380,661.90 to bring the loan current, or paid the regular monthly payments of $24,307.45 to keep the loan current had the principal balance not been $3,487,501.16, had the payment of $380,661.90 and the regular monthly payment of $24,307.45 not cured, reinstated, and kept the loan current, had the regular monthly payments of $24,307.45 not been based on interest at 6.5% and been applied to both principal and interest, had I been advised by BPB of the environmental issues with the Property, and had I been advised by BPB that it may attempt to assert any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs.

**F. December 2012-Sale of Property and Debtor's Discovery of Environmental Contamination and BPB's Non-Disclosure.**

In November 2012, Debtor found a buyer and entered into a contract for the sale of the Property for $7.3 million dollars. The escrow was scheduled to close in December 2012. This sale would have paid off BPB's lien. However, during their due diligence, the buyer discovered that the Property was listed with the State and/or County as undergoing clean-up or investigation due to a possible leak from an old underground storage tank. Specifically, while conducting a Phase I, Environmental Investigation, the buyer discovered the existence of prior reports filed showing that the Property was contaminated. As a result of the

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 10 of 34

discovery, the buyer cancelled the sale.

This discovery by the buyer was the first notice that Debtor had of any contamination on the Property. However, Debtor was informed that BPB had been aware of the contamination since 2008, had a copy of a report showing purported contamination, and never disclosed the report or the purported contamination to Debtor. Had BPB disclosed this information to Debtor, Debtor would not have paid BPB $793,880 to cure the default, made the regular monthly payments under the First DOT to keep the loan current, or invested another $242,000 in leasing commissions to find a tenant. In addition, had BPB disclosed this information, not affirmatively acknowledged the declining principal ($3,460,917.00 in the Third Agreement), not reinstated or treated the loan as current, not based the regular monthly payment of $24,307.45 on 6.5% and applied such payments to interest and principal, or asserted any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs then IGL and Debtor would not have entered into the Foreclosure Agreement or taken any of the actions described herein.

### G. May 2013-Proposed Fourth Amendment, Agreement to Suspend Payments, and Release of Claims.

Debtor continued to make the regular monthly payments of $24,307.45 to BPB through March 2013 to keep the loan current. Around that time, BPB, IGL and Debtor negotiated the terms for a fourth amendment regarding the foreclosure sale. Under the terms as negotiated, Plaintiff agreed that so long as Debtor and IGL took certain steps to obtain a "closure and/or no further action letter" regarding the contamination from the required regulatory agency, and to the extent required, pay for any additional environmental investigation, testing, remediation and/or other work, kept BPB apprised of the progress, and obtained a "closure and/or no further action letter" resolving all environmental issues no later than April 30, 2014, then no monthly payments after March 2013 would be due, and the foreclosure sale would be continued through April 30, 2014. Debtor negotiated this amendment directly with Bruce Brown of BPB.

In reliance upon the agreement that no payments were due after March 2013, Debtor did not make payments pending the drafting and execution of the fourth amendment. The draft fourth amendment was not received until May 2013. Consistent with the negotiations, the draft fourth amendment stated that no payments would be due after March 2013. However, contrary to prior discussions, the proposed "Fourth Amendment to Agreement Re Foreclosure Sale" (the "Fourth Amendment"), required Debtor, IGL, and their predecessors to release BPB from any claims relating to the Property including any environmental issues. As BPB had failed to disclose the environmental contamination to Debtor prior to and during its dealings and did not know the severity of the contamination and cost of remediation, Debtor refused to execute the Fourth Amendment. The Fourth Amendment, prepared by BPB and presented to Debtor for signature, indicated a principal balance on the loan of $3,341,017.00.

In late January or early February 2013 Debtor contacted BPB because Debtor needed payment information for its tax returns and had not received a 1098 or similar form from BPB. On February 4, 2013 Debtor received a facsimile from BPB consisting of a payment history on the loan. The payment history reflects a payment history for 12/27/11 through 12/31/12, a principal balance of $3,460,916.67, regular monthly payments of $24,307.45, but an allocation of the payment only to interest and at 8%. (A true and correct copy of this fax is attached to the Declaration of Andrew A. Lewis as Exhibit B). Therefore, Debtor contacted Bruce Brown of BPB, indicated that the payment history was incorrect in terms of the interest rate and application of the regular monthly payment to interest and principal, and asked that the errors be corrected immediately and made consistent with our agreement that the loan was brought current and kept current by the prior payments so Debtor could prepare its tax returns. BPB agreed to correct the errors.

On February 25, 2013 Bruce Brown of BPB emailed an adjusted amortization schedule which referenced the loan, the payment history from July 19, 2011 through February 15, 2013, the interest rate at 6.5%, the regular monthly payment of $24,307.45, the application of

Case: 13-53491   Doc# 119   Filed: 12/13/13   Entered: 12/13/13 16:45:12   Page 12 of 34

the regular monthly payment to principal and interest at 6.5%, a declining principal balance, and a principal balance of $3,347,194.03. (A true and correct copy of this Amortization Schedule is attached to the Declaration of Andrew A. Lewis as Exhibit C). Debtor secured this amortization schedule from BPB for its 2012 taxes, reasonably relied upon this information, and used this information for its 2012 tax returns.

**H. May 13, 2013-BPB Serves Demand on Tenant to Pay All Rents to BPB.**

On or about May 17, 2013 BPB served a "Demand That You Pay Rent To A Party Other Than The Landlord" on the tenant. Debtor received confirmation that the tenant would comply with the demand and pay all rents directly to BPB. In compliance with the demand and commencing June 2013, BPB received and continues to receive all the rent, i.e. $39,600, directly from the tenant (this rent was about $15,300 more than the regular monthly payment). Pre-petition Debtor tendered, and continued to tender, immediate payment of the total arrearage, thereby bringing and maintaining the loan current. BPB wrongfully rejected this tender.

**I. State Court Action.**

On June 10, 2013, BPB filed a Verified Complaint For (1) Judicial Foreclosure; And (2) Specific Performance And Appointment of Receiver commencing a state court action against Kimomex and Debtor, Santa Clara County Superior Action No.: 1-13-CV-247961 ("State Court Action") and wherein BPB, under penalty of perjury, repeatedly asserted "As of June 10, 2013, there is due, owing and outstanding under the Promissory Note the principal amount of $3,341,017.20 . . .". Although the State Court Action does not acknowledge the prior agreements and prior payments, it does not assert or quantify any claim for default interest. This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor reasonably relied upon this information.

**J. Bankruptcy.**

On June 27, 2013, Debtor commenced this Chapter 11 bankruptcy case ("Bankruptcy

Case"). No Receiver or Trustee has been appointed, and the Debtor remains a Debtor in Possession under Chapter 11 of title 11, United States Code sections 1107 and 1108. The bankruptcy was filed to avoid the unnecessary and expensive appointment of a receiver, to prevent BPB's pending foreclosure, and protect Debtor's substantial investment and substantial equity.

On October 7, 2013, the court issued an Order Denying Motion for Order Confirming No Stay with Respect to Rent and Denying Cross-Motion for Use of Cash Collateral (Doc#64). On October 7, 2013, this court issued an Order Denying Motion for Order Confirming No Stay with Respect to Rent and Denying Cross-Motion for Use of Cash Collateral ("Order")(Doc#64) which, in summary confirmed Debtor's position that the post-petition rental income was property of the estate pursuant to Bankruptcy Code 541 and cash collateral of BPB and may not be used by Debtor absent consent of BPB or order of the court.

Debtor attempted to secure an agreement with BPB regarding the use of cash collateral, prior to and after this court's Order, but BPB refused to consent[3] to Debtor using such funds to pay BPB its contractual interest payment of $24,307.45 for the post-petition months of July-October and thereafter as monthly rental income of $39,600 is received from Debtor's tenant, to pay United States Trustee Quarterly Fees as invoiced by the United States Trustee ("UST"), and to hold the balance of such funds in Debtor's DIP account pending an agreement with BPB and/or an order from this court and without prejudice to the rights of BPB or Debtor. Debtor's Motion to Use Cash Collateral Filed by Debtor 272 E Santa Clara Grocery, LLC (Doc#80) was amended following Debtor's sale of real property.

### K. Status of Environmental Issue.

Debtor contracted with ERAS Environmental, Inc. ("ERAS") to assist Debtor address the environmental issues and secure government clearance so the Property can be sold. On August 26, 2013 the Santa Clara County Department of Environmental Health ("DEH")

---

[3]BPB orally refused to consent to the use of such funds and then refused to consent to us of such funds in writing (twice).

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 14 of 34

advised Debtor that based on their review it appeared that the Property qualified for closure under State Water Resource Control Board Low-Threat Underground Storage Tank Case Closure Policy ("LTCP"), no further action was required at that time, and the matter would proceed through the closure process which it continues to do.

## III. Debtor Objects To the BPB Claim on Several Factual and Legal Grounds.

### A. BPB'S Principal Claim Is Overstated and Contradicts Previous Sworn Statements Relative to the Outstanding Principal Due.

Debtor objects to BPB's principal claim because it is improperly overstates and contradicts the repeated, sworn and represented amount of outstanding principal by at least $214,151.50.

On June 10, 2013, BPB filed a Verified Complaint For (1) Judicial Foreclosure; And (2) Specific Performance And Appointment of Receiver commencing a state court action against Kimomex and Debtor, Santa Clara County Superior Action No.: 1-13-CV-247961 ("State Court Action") and wherein BPB, under penalty of perjury, asserted "As of June 10, 2013, there is due, owing and outstanding under the Promissory Note the principal amount of $3,341,017.20 . . ."[4]

On July 12, 2013, BPB, through David Scheiber, Senior Vice President- Special Assets Department of BPB, filed a declaration, under penalty of perjury, and asserted that the outstanding balance due and owing by Debtor to BPB on the First DOT as of June 27, 2013 totaled $3,341,017.20. Specifically, BPB asserted "As of June 27, 2013, the outstanding principal balance due and owing from Kimomex under the Promissory Note and other Loan Documents is $3,341,017.20 . . ." ("Scheiber Declaration")(Doc#22-2[5], entered July 12, 2013, page 3, paragraph 7)

---

[4]The State Court Action was filed by BPB's current counsel and verified by David Scheiber and is subject to judicial notice pursuant to Federal Rules of Evidence 201.

[5]The court may take judicial notice of its own files pursuant to Federal Rules of Evidence 201 and such files are referred to herein as "Doc", meaning Docket, and corresponding Docket number

On July 30, 2013 BPB filed a Reply in Support of its Ex Parte Applications for Orders of Examination and for Production of Documents Pursuant to Bankruptcy Rule 2004, in support of numerous 2004 applications (Doc#31-36 and 41) asserting "BPB holds the senior lien on the Property securing a loan with an outstanding principal balance of $3,341,017.20". (Doc#42, entered July 30, 2013, page 3, lines 7-8) At the same time BPB also re-filed the Scheiber Declaration to support the alleged principal balance of $3,341,017.20. (Doc#31-3, entered July 30, 2013, page 3, paragraph 7)

On August 12, 2013 BPB filed an additional 2004 application and asserted "BPB holds the senior lien on the Property securing a loan with an outstanding principal balance of $3,341,017.20. (Counsel Decl. Exh. 1 ("Scheiber Declaration"), at ¶7.)" (Doc#45, page 2, paragraph 3)

On August 14, 2013 BPB filed Secured Creditor Boston Private Bank & Trust Company's Opposition to Debtor's Cross Motion for Use of Cash Collateral and asserted "As of the Petition Date, the outstanding principal balance due and owing from Kimomex to BPB under the Note and other Loan Documents was $3,341,017.20 . . ." (Doc#50, page 4, lines 6-9).

On October 15, 2013 BPB filed a Declaration of Counsel In Support of Opposition to Ex Parte Application For Order Directing Boston Private Bank & Trust Company's Production of Documents Under Bankruptcy Rule 2004 and asserted "BPB holds the senior lien on the certain leased real property located at 272 E. Santa Clara Street, San Jose, Ca. (the "Property") securing a loan with an outstanding principal balance of $3,341,017.20". (Doc#51, page 5, lines 3-5)

Similarly, BPB consistently provided Debtor with confirmation of the principal amount owed under the loan and First DOT upon which Debtor relied. Debtor would not have pursued foreclosure of its Second DOT, the various agreements with BPB, secured a tenant, or paid BPB and various related expenses totaling approximately $1,033,880 ($380,661.90 to BPB to cure and reinstate the loan, $242,000 in leasing commissions, and $413,219 to BPB ($24,307.45 from July 2011-March 2013) for regular monthly payments of

principal and interest to keep the loan current if the principal was not as represented by BPB. Debtor rightfully relied upon BPB's representations of principal as reflected in its June 2011 reinstatement letter (principal $3,487,501.16), in the March 2012 BPB Third Amendment (principal $3,460,917.00), its February 2013 Amortization Schedule (principal $3,347,194.03), and in the March 2013 Fourth Amendment (principal $3,341,017.00).

Yet, just as Debtor moved to sell the Property BPB filed the BPB Claim and asserted, contrary to all prior declarations and documents, that "As of the petition date, the outstanding principal due and owing from Kimomex under the Promissory Note and other Loan Documents is $3,555,168.55. (Proof of Claim No. 2, page 5) Suddenly, as Debtor moves to sell the Property, a $214,151.35 ($3,555,168.55-$3,341,017.00) difference in the claimed principal arises and said difference is reflected between BPB's agreements with Debtor, the Verified Complaint in the State Court Action, and repeatedly filed declarations and representations made in this bankruptcy case on the one hand and the BPB Claim on the other hand.

Debtor objects to the BPB Claim as it includes an incorrect and backdated principal figure.

**B. BPB's Purported Calculation of Interest Is Also Overstated Because Its Principal Claim Is Overstated, It Contradicts Previous Sworn Statements Relative to the Outstanding Principal Due, It Is Miscalculated, and It Neglects to Account for Debtor's November 8, 2013 Payment.**

Debtor objects to the BPB Claim, in addition to the reasoning discussed hereinafter, because the principal claim is overstated and contradicts the repeated, sworn and represented amount of outstanding principal by at least $214,151.50 and thus results in an overstatement of any calculation of interest, whether it be contract interest at 6.5% or alleged default interest at 8.5%, relative to the overstated principal. The BPB Claim asserts two different interest totals, $217,401.61 as of October 15, 2013 and $242,584.05 as of November 15, 2013 a difference of $25,182.44. As discussed hereinabove and hereinafter said figures are both miscalculated.

On November 8, 2013 Debtor, pursuant to the court's October 30, 2013 Order Granting Motion to Sell Real Property (272 E. Santa Clara St.) Free and Clear of Liens and Pay Broker/agent (Docket#89), paid BPB $3,341,017.20 in principal. BPB has not amended the BPB Claim or acknowledged such principal payment.

**C. BPB's Entire Claim Was Admittedly Backdated.**

Debtor objects to the BPB Claim because it was, admittedly, backdated. Debtor rejects the explanation for the backdating as "based on a proper allocation of prior payments" as alleged therein. Debtor also rejects BPB's alleged explanation that prior to preparation of its claim it had not formally calculated the outstanding balance as alleged therein as such is, highly implausible, and contrary to every written representation BPB provided to Debtor. Debtor submits that BPB, in an effort to improperly maximize its recovery, admitted backdated its calculations.

**D. BPB Has Improperly Asserted Default Interest Against the Debtor and Improperly Backdated the Alleged Default Date.**

Debtor objects to the BPB Claim on the grounds it improperly asserts default interest at 8.5% interest against Debtor and improperly backdates such default interest to May 5, 2009. A creditor must take affirmative action to put the debtor on notice that it intends to exercise its option to accelerate and in turn charge the default interest rate. Beal Bank v. Crystal Props., LTD. (In re Crystal Props., LTD.), 268 F.3d 743, 747-748 (9th Cir. Cal. 2001); see also In re Zamani, 390 B.R. 680, 2008 Bankr. LEXIS 1923, 60 Collier Bankr.117 (Bankr. N.D. Cal. 2008). BPB failed to put Debtor on notice of its intention to accelerate the note and seek default interest. In fact, BPB did the opposite.

BPB was aware of Debtor's junior deed of trust on the Property and did not assert any objection relative thereto, negotiated and entered into various agreements with Debtor wherein BPB specified the amounts necessary to cure arrears and Debtor needed to pay and accepted these payments from Debtor over the course of approximately 2 1/4 years to keep the loan current without objection, was aware of Debtor's foreclosure on its junior deed of

trust on the Property and did not assert any objection relative thereto, was aware of Debtor's efforts to ready the Property to secure a tenant and that it had secured a tenant and did not assert any objections relative thereto, was aware of Debtor's efforts to market and sell the Property and of its December 2012 sale and did not assert any objection relative thereto, continued to accept regular monthly payments from Debtor without objection or reservation, and at no time prior to the commencement of this case did BPB ever claim default interest.

In reliance thereon, Debtor foreclosed on its junior deed of trust, paid substantial monies to BPB to cure its arrears, paid substantial monies to BPB to maintain its regular monthly contract payment to keep the loan current, paid substantial monies to others to ready the Property for a tenant and to secure a tenant, and marketed the Property for sale and secured a buyer-only to have the sale fall through due to BPB's non-disclosure of the environmental issue. Similarly, BPB consistently provided Debtor with confirmation of the principal amount owed under the loan and First DOT upon which Debtor relied. Debtor would not have pursued foreclosure of its Second DOT, the various agreements with BPB, secured a tenant, or paid BPB and various related expenses totaling approximately $1,033,880 ($380,661.90 to BPB to bring the loan current and reinstate the loan, $242,000 in leasing commissions, and $413,219 to BPB ($24,307.45 from July 2011-March 2013) for regular monthly payments of principal and interest to keep the loan current if the principal was not as represented by BPB. Debtor rightfully relied upon BPB's representations of principal as reflected in its June 2011 reinstatement letter (principal $3,487,501.16), in the March 2012 BPB Third Amendment (principal $3,460,917.00), its February 2013 Amortization Schedule (principal $3,347,194.03), and in the March 2013 Fourth Amendment (principal $3,341,017.00).

The Promissory Note between BPB and Kimomex provides the borrower with a right to cure and provides that various defaults are curable. Debtor submits that Debtor cured all curable defaults or such were waived by BPB.

**E. The BPB Claim Improperly Includes Late Fees Notwithstanding Debtor**

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 19 of 34

**Cured BPB's Claimed Monetary Defaults and Caused Timely Monthly Payments to Be Made Thereafter and Through Present.**

The BPB Claim improperly asserts late fees notwithstanding Debtor cured BPB's claimed monetary defaults and bring the loan current in approximately July 2011 and caused timely, regular monthly payments to be made thereafter to keep the loan current, including those payments intercepted by BPB from Debtor's tenant and/or that which BPB refused to accept.

The BPB Claim asserts late fees of $1,215.37 a month from July 19, 2011 to October 15, 2013 and totaling $34,030.36 as of November 15, 2013. Yet, the same BPB Claim simultaneously asserts payments made from July 19, 2011 through March 15, 2013, fails to acknowledge a May 2013 agreement between BPB and Debtor that monthly payments need not be made, fails to acknowledge that pre-petition BPB received the June 2013 rent payment of $39,600 following BPB's May 17, 2013 BPB Demand That You Pay Rent To A Party Other Than The Landlord, and fails to acknowledge that post-petition BPB intercepted $39,600 for four consecutive months (July-October 2013) totaling $158,400 ($39,600 x 4) and then refused to accept payments of $24,307.45 from Debtor for the months of July-October 2013 and thereafter as Debtor's tenant paid its monthly rent. Debtor filed a Motion for Use of Cash Collateral because BPB refused to accept such payments.

BPB has no basis to charge Debtor late fees.  As stated hereinabove, Debtor has made all payments as agreed, BPB received overpayments from Debtor's tenant or simply refused to accept payments, and Debtor only stopped making payments pursuant to a verbal agreement with BPB that no payments needed to be made until the environmental issue relative to the Property could be resolved (as referenced in the Fourth Amendment Re Foreclosure Sale) and then BPB intercepted, kept, and should have applied the April, May, and June 2013 $39,600 each ($118,800) and then wrongfully intercepted, held without applying payments against the loan, belatedly turned over to Debtor rents for July-October 2013, but then refused to accept payments for July-October and thereafter from Debtor at

$24,307.45 per month.

**F. BPB Is Not Entitled to Attorney's Fees or Costs From Debtor Because They Are Not Included in The BPB Claim, Debtor Is Not BPB's Borrower, Debtor Has Been the Prevailing Party on All Actions Asserted by BPB, and BPB's Attorney's Fees Were Not Reasonable or Necessary.**

Debtor objects to the BPB Claim on the grounds it simply asserts that BPB is entitled to attorney's fees and costs, but omits any basis, figures, supporting documents, or supporting evidence. Similarly, to the extent BPB has an attorney's fee claim such rest against its borrower Kimomex, and any guarantors of such loan and not Debtor. Although the BPB Claim omits any basis, figures, supporting documents, or supporting evidence for a claim for attorney's fees and for asserting such claim against the Debtor, Debtor objects to the anticipated claim on the grounds that Debtor prevailed on all actions asserted by BPB and BPB's attorney's fees were not reasonable or necessary. Some non-exclusive examples are worth noting.

As of the date of this Objection BPB has objected to Debtor's employment of Debtor's counsel and employment of Debtor's Special Counsel, only to cause Debtor unnecessary expense and thereafter withdraw those objections[5]. BPB filed multiple applications for 2004 examinations to examine Debtor's members without ever applying to examine Debtor; filed multiple applications for 2004 examinations to examine Debtor's members regarding potential preference claims to which it did not have a security interest and knew were invalid due to Debtor's solvency; filed an application for examination of Debtor's environmental consultant ERAS Environmental, Inc. and then never submitted the order and notwithstanding BPB's knowledge that ERAS Environmental, Inc's report would be a matter of public records once filed with the County of Santa Clara and it would be filed upon payment of the outstanding balance of $6,359.10-which Debtor's creditor advanced due to

---

[5]Debtor submits that BPB, which does not have any direct interest in Debtor's claim against the guarantors of Debtor's loan objected to Debtor's employment of Special Counsel because BPB has a judgment against the same parties based on an obligations unrelated to the Property and wanted to deter Debtor's collection efforts.

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 21 of 34

BPB's delays in agreeing to pay such balance from cash collateral and/or rent and which substantially delayed Debtor's receipt of a No Further Action letter from the County of Santa Clara; and then proceeded with one examination of member and creditor Andrew A. Lewis for ½ day via video tape (the examination was not officially concluded and the underlying application did not relate to Mr. Lewis's capacity as Debtor's manager or Responsible Individual.

BPB then filed a motion to determine that the bankruptcy's automatic stay did not apply to post-petition rents notwithstanding authority to the contrary, delayed turning over such property of the estate upon receipt of the court's October 7, 2013 order finding such post-petition rents as property of the estate, and then refused to consent to any use of such cash collateral, including to pay BPB.

Debtor objects to the BPB Claims on the grounds that the BPB Claim simply asserts that it is entitled to attorney's fees and costs, but omits any basis, figures, supporting documents, or supporting evidence; its true claim is against its borrower Kimomex and any guarantors of such loan and not Debtor; and such attorney's fees and costs were not reasonable or unnecessary[6].

### G. Debtor Has Multiple Claims Against the BPB Claim.

Debtor submits that it has multiple claims against BPB. Some non-exclusive examples are worth noting.

#### 1) BPB Willfully Violated the Automatic Stay and Caused Debtor Damages Yet to Be Quantified.

Pursuant to 11 USC §362 a creditor must cease all collection action against a debtor and against property of the bankruptcy estate. Failure to cease collection action is a violation of the automatic stay and entitles debtors to damages, including punitive damages, for a

---

[6]Debtor recently received BPB's response to Debtor's Objection, notwithstanding Debtor's counsel indicated that Debtor was going to file an amended objection. Debtor has not had sufficient time to review the claimed attorney's fees and costs and will supplemental this objection to address those portions of BPB's claim.

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 22 of 34

creditor's willful violation.

BPB was put on notice of the commencement of this bankruptcy on June 27, 2013, the petition date, filed a Request For Notice within three days of the bankruptcy filing Doc# 11, and had clear notice of the bankruptcy and of the automatic stay. Yet, BPB refused and failed to cease its collection actions against Debtor by not advising Debtor's tenant that post-petition rental payments should be made directly to Debtor, continuing to intercept rent payments, filing an unsuccessful motion to determine that such post-petition rents were not property of the estates notwithstanding authority to the contrary, delaying the turnover of such funds after receipt of the court's October 7, 2013 order finding such post-petition rents are property of the estate, not advising Debtor's tenant to direct post-petition rental payments directly to Debtor after receipt of the court's October 7, 2013 order, and refusing to accept payments from Debtor. Preliminarily, BPB's violations of the automatic stay have resulted in damages to Debtor, including but not limited to, damages in the form of attorney's fees and costs, claims of additional interest and late fees and attorney's fees and costs by BPB, and punitive damages.

### 2) BPB Failed to Disclose Known Environmental Issues on The Property While Entering Into Agreements With Debtor and Accepting Payments and Thereby Caused Debtor Damages.

Debtor, as discussed hereinabove and in its Schedule B, asserts that it has a claim against BPB for BPB's failure and refusal to disclose to Debtor, prior to, during, and after, the various agreements between them and while Debtor was making substantial payments to BPB and others while BPB knew the Property had a material environmental issue.

As a result of BPB's non-disclosure and withholding of such material information, Debtor paid considerable monies to BPB and incurred substantial expenses to bring and keep BPB current, paid substantial monies to others ready the Property for a tenant and secure a tenant, and paid substantial monies to ERAS Environmental, Inc. to assist Debtor secure a No Further Action letter from the County of Santa Clara. In addition, as a result of BPB's non-disclosure and withholding of such material information Debtor lost a sale of the

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 23 of 34

Property in December 2012, incurred, paid, and/or will incur and/or pay substantial additional interest to BPB (approximately $291,689.40 (12 x $24,307.45, December 2012-November 2013), substantial additional interest and penalties on outstanding real property taxes (18% interest and penalties estimated in excess of $50,000 since December 2012), and substantial attorney's fees and costs, and may have lost interest and/or profits on the net proceeds of a sale of the Property.

### H. BPB Waived Any Right to Belatedly Backdate Debtor's Payments and Charge Default Interest and Late Fees.

Generally, a party may waive its right to enforce certain terms of a contract through"acts or conduct which naturally and justifiably led the other party to believe that he has waived the right." Donicker Corp. v. Pittsburgh Nat'l Bank, 1994 U.S. App. LEXIS 31528 at *14 (9th Cir. Guam Nov. 9, 1994) (citation and internal quotation omitted). "Implied waiver is an equitable doctrine not based in contract." Id. at *15. Waiver exists when "a party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished . . . Reasonable belief refers to the belief of the party asserting waiver." Darling Int'l, Inc. v. Baywood Partners, Inc., 2007 U.S. Dist. LEXIS 50985 (N.D. Cal. July 13, 2007) (internal citations and quotations omitted)(See also, Rubin v. L.A. Fe. Sav. & Loan Ass'n (1984) 159 Cal.App.3d 292, 298; Knarston v. Manhattan Life Ins. Co. (1903) 140 Cal. 57, 63).

Prior to the filing of the BPB Claim BPB consistently asserted to Debtor, the state court, and this court specific principal figures and contract interest at 6.5% and did not assert a claim for default interest. Pre-petition communications between Debtor and BPB, every state court filing by BPB, and every Bankruptcy Case filing by BPB prior to the BPB Claim asserted specific principal figures and contract interest at 6.5% and did not assert a claim for default interest at 8.5% or the right to backdate over three (3) years of payments. BPB did not notify the Debtor that it was asserting a claim for default interest or intended to belatedly backdate three (3) years of payments, including backdating Debtor's payment of $380,661.90

Case: 13-53491     Doc# 119     Filed: 12/13/13     Entered: 12/13/13 16:45:12     Page 24 of 34

in July 2011 to bring the loan current, Debtor's payment of $413,219 to BPB's for its regular monthly payment from July 2011 through March 2013 to keep the loan current, and then full rental payments of $118,800 (April-June 2013 ($39,600 x 4)) intercepted by BPB from Debtor's tenant. Instead, from approximately July 2011 through October 2013 BPB presented Debtor with documents, engaged in negotiations with Debtor, entered into agreements with Debtor, presented Debtor with an additional agreement, initiated a state court action, and filed various pleadings in this Bankruptcy Case which consistently asserted principal figures, declining principal figures, the application of monthly payments against principal and interest, and interest at 6.5%. Over the same time period BPB accepted, without objection, approximately $912,680.90 to bring the loan current and keep the loan current, and watched Debtor spend an additional $240,000 in leasing commissions and secure a tenant, without asserting a claim for default interest or a right to backdate these payments. BPB's silence constituted and constitutes an unequivocal waiver of its right to charge default interest and late fees. See, e.g., Darling Int'l, Inc. v. Baywood Partners, Inc., supra, 2007 U.S. Dist. LEXIS 50985 at *54-57 (lack of communication corroborated waiver of right to assert contract termination); In re Korn, 352 B.R. 228, 243-44 (Bankr. D. Idaho 2006) (waiver based on failure to declare breach or to seek remedies under sale agreement); Howard J. White, Inc. v. Varian Associates, 178 Cal.App. 2d 348, 355 (Cal. App. 1st Dist. 1960) (conduct impliedly waived contract requirement of written change orders); Varela v. Wells Fargo Bank, 15 Cal. App. 3d 741, 749 (Cal. App. 3d Dist.1971) (acceptance of payments by secured creditor precluded secured creditor from exercising remedies).

The principles of waiver and/or estoppel apply to limit the right to charge default interest retroactively, as BPB now attempts to do. (See, e.g., In re Sweet, 369 B.R. 644, 652 (Bankr. D. Colo. 2007) (where predecessor secured party did not exercise right to assess default interest, subsequent assignee could not retroactively do so); 400 Walnut Assocs., L.P. v. 4th Walnut Assocs., L.P., (In re 400 Walnut Assocs., L.P.), 461 B.R. 308, 314 (Bankr. E.D. Pa. 2011) (failure of predecessor to exercise right to charge compound interest

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 25 of 34

constituted waiver of such right as to assignee who stands in the shoes of predecessor); In re Harvest Oaks Drive Assocs., LLC, 2011 Bankr. LEXIS 146 at *29-33 (Bankr. E.D.N.C. Jan. 14, 2011) (discussing issue of assignee's entitlement to retroactive default interest when the asserted default was "overlooked or, for whatever reason, not asserted by the original assignor" and holding that assignee was precluded from charging default interest until it itself provided notice of its intent to do so)).

It is plainly unfair for BPB to outwardly agree to Debtor's cure of the loan for approximately 2 1/4 years through negotiations, agreements, accepted payments, a pending sale, a lawsuit, and part of a bankruptcy and then ambush the Debtor with substantial claims for additional principal, default interest, late fees and penalties, and a backdated application of Debtor's payments–all retroactively. Such penalties should not be borne by the Debtor and it estate or tolerated and approved by this court.

California law recognizes the equitable doctrine of waiver. Waiver may be shown by conduct, and it may be the result of an act which, according to its natural import, is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished. Howard J. White, Inc. v. Varian Associates, 178 Cal. App. 2d 348, 355 (Cal. App.1st Dist. 1960). BPB's conduct evidenced its intent to treat the loan as cured, not to assert default interest or late fees, or the right to backdate approximately 2 1/4 years of payments. Debtor reasonably relied on its communications with BPB, BPB's representations, BPB's written communications, BPB's acceptance of payments, the negotiations with BPB, BPB's state court filings, and BPB's filings in this Bankruptcy Case regarding the outstanding principal, the applicable interest rate, the cure of the loan, and the application of payments to principal and interest. Debtor reasonably believed that BPB accurately and honestly represented the outstanding principal balance, the applicable interest rate, the application of payments to principal and interest[7]. BPB did not assert default interest

---

[7]Debtor was never asked to assume the loan, was not provided copies of the loan, and had no

(continued...)

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 26 of 34

or late fees from July 2011 through October 2013 until the filing of the BPB Claim. It was only after Debtor's payment to BPB of $380,661.90 in July 2011, Debtor's payment to BPB of $413,219 for BPB's regular monthly payment from July 2011 through March 2013, Debtor's payment of $240,000 in leasing commissions and the securing of a tenant, BPB's interception of full rental payments of $118,800 (April-June 2013 ($39,600 x 4)), the filing of a state court action, the commencement of this Bankruptcy Case, four months of this Bankruptcy Case and several pleadings by BPB, and the filing of Debtor's motion to sell that BPB asserted a claim to default interest, late fees, and the right to belatedly backdate two and half (2 ½) years of payments. BPB's belated backdating, as discussed hereinabove, purports to increase the principal debt owed by BPB by approximately $214,151.35, add additional interest and late fees for several years (apparently back to 2009), and bonus itself an additional $465,643.30, plus attorney's fees.

### I. BPB Must Be Estopped From Belatedly Backdating Debtor's Payments and Charging Default Interest and Late Fees.

It is axiomatic that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restat 2d of Contracts, § 90. In such instance, "[t]he remedy granted for breach may be limited as justice requires." Id. See also Garcia v. World Savings, FSB, 183 Cal. App. 4th 1031, 1045 (Cal. App. 2d Dist. 2010) (agreement to postpone foreclosure to enable borrower to refinance). Although no consideration or benefit accrues to the promisor, "[t]he vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted." Id. at 1041 (*citation and quotation*

---

[7](...continued)
choice but to rely on BPB's representations, oral and written and sworn and unsworn, regarding the cure of the loan, the declining principal balance, and the application of the regular monthly payments to interest and principal.

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 27 of 34

*omitted*).

Here, Debtor relied upon and acted upon BPB's representations when it moved forward with foreclosure of the Second DOT, took ownership of the real property, negotiated with and entered into various agreements with BPB, paid BPB $380,661.90 to cure and reinstate the loan, paid BPB $413,219 from July 2011 through March 2013 in regular monthly payments to keep the loan current, paid leasing commissions of $240,000 and secured a tenant, paid BPB $118,800 (April-June 2013 full rental payments), paid ERAS Environmental, Inc. ("ERAS") substantial monies to address environmental issues with the real property (that BPB did not previously disclose to Debtor), defended a state court action by BPB, responded to BPB's representations to this court, and secured a sale of the real property. Debtor's action were premised on BPB's consistent representations of the amounts necessary to bring and keep the loan current, the outstanding principal balance, the interest rate of 6.5%, the proper allocation of regular monthly payments to principal and interest, and the absence of any indications or representations that BPB would assert default interest, late fees, and/or the right to belatedly backdate Debtor's payments, charge default interest and late fees, and seek to bonus itself approximately $465,643.30, plus attorney's fees.

BPB's conduct falls precisely within the doctrine of estoppel. The Court, in its equitable discretion, should disallow any belated backdating of Debtor's payment or the charging of default interest or late fees.

### J. BPB Is Not Entitled to Default Interest Or Late Fees Under Applicable Nonbankruptcy Law.

In determining whether the contractual default rate should be applied, the Ninth Circuit has adopted the majority rule that the bankruptcy court should apply a presumption of allowability for default rate interest, provided that the rate is not unenforceable under applicable nonbankruptcy law. (General Electric Capital Corp. v. Future Media Productions, Inc., 536 F.3d 969, 974 (9th Cir. 2008). The default interest and late fee provisions asserted by BPB bear no relationship to actual damages and are unenforceable under California law.

California law has long recognized that a provision for liquidation of damages for contractual breach, for example a preset late payment fee, can under circumstances be designed as, and operate as, a contractual forfeiture. Ridgley v. Topa Thrift & Loan Ass'n, 17 Cal.4th 970, 977 (Cal. 1998). To prevent such operation, California places limits in liquidated damage clauses. Under California law, "liquidated damages" means the amount of compensation to be paid in the event if breach of contract, the sum of which is fixed and certain by agreement. Chodus v. West Publishing Co., 292 F.3d 992, 1002 (9th Cir. 2002).

California Civil Code Section 1671 (b) provides, in relevant parts, that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Under this section, the "liquidated damages need only bear a reasonable relationship to the range of harm the parties might reasonably have anticipated when the entered into the contract." In re VEC Farms, LLC, 395 B.R. 674, 685 (Bankr. N.D. Cal. 2008); Ridgley, supra, 17 Cal.4th at 977; see also Harbor Island Holdings v. Kim, 107 Cal.App.4th 790, 799 (Cal.App.4th Dist. 2003)(Fact that lease at issue was "a commercial lease negotiated by seasoned business entities, and not a consumer lease between unsophisticated individuals, has no bearing on the result.") and Garrett v. Coast & Southern Sav. & Loan Ass'n (1973) 9 Cal.3d 731, 739 (noting that the amount set as liquidated damages "must represent the result of reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained."). In the absence of such relationship, a contractual clause purporting to predetermine damages must be constructed as a penalty and is ineffective. Id. At 977-98. The party seeking to rely on a liquidated damages clause bears the burden of proving its enforceability. Garrett, supra, 9 Cal.3d at 738.

Here, there is no reasonable relationship between any anticipated harm or administrative costs and BPB's claim for both default interest at 8.5% and late fees and BPB did not endeavor to estimate the amount of fair compensation for damages-which Debtor

submits were none.

In In re Charles St. African Methodist Episcopal Church of Boston ("CSAME"), 2012 Bankr. LEXIS 4321 (Bankr. D. Mass. Sept. 18, 2012), the Massachusetts bankruptcy court considered whether a lender was entitled to pre-petition default interest under Massachusetts law which, similar to California law, does not permit liquidated damages which do not, at the time of contracting, represent a reasonable forecast of damages expected to occur in the event of a breach. Id. at *24. In CSAME, the loans at issue calculated default interest at the greater of 18% percent per annum or 5% greater than the then floating prime rate. The court found that this calculation created two separate default rates including a variable rate equal to the floating prime rate plus 5 percent which would apply when the floating prime exceeded 13 percent. Id. at *25. This calculation led the court to believe that the lender did not engage in any reasonable estimation of its anticipated damages. Similar reasoning applies here where the Note's default interest also establishes a floor with increases based on a fluctuating prime rate.

BPB cannot offer any legitimate explanation for its attempt to belatedly backdate Debtor's payments and charge default interest and late fees. BPB has not attempted to calculate any actual harm not already cured by Debtor.  In CSAME the court found that the lender's argument failed because it did not calculate the rate separately for the particular loans in question and the lender produced no evidence of having calculated its anticipated costs with respect to such loans. Id. at *16. At no time prior to BPB Claim, and inconsistent with all of BPB's actions and inactions, did it attempt to calculate its anticipated costs in assessing default interest for the particular loan in question and, even now, it cannot reconcile any reasonable relationship between the default interest and its actual damages. There simply is no rational basis for the penalties BPB is attempting to belatedly assess on Debtor. In considering the other factors delineated in the Law Revision Commission Comment to Cal. Civ. Code §1671, Debtor notes that it was not represented by counsel in negotiations with BPB while BPB was, BPB held a superior bargaining position when

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 30 of 34

negotiating with Debtor, and BPB cannot be allowed to unfairly profit from its belated attempts to change history and positions. California law precludes BPB from charging default interest and late fees and attempting to do so belatedly.

### K. BPB's Claims For Backdated Principal, Default Interest, and Late Fees Are Barred by The Doctrine of Judicial Estoppel.

Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." Whaley v. Belleque, 520 F.3d 997, 1002 (9th Cir.2008) (quoting Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir.1996)). It is "an equitable doctrine invoked by a court at its discretion," New Hampshire v. Maine, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.1990)), and "is intended to protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts." Whaley, 520 F.3d at 1002 (quoting Wagner v. Prof'l Eng'rs in Cal. Gov't, 354 F.3d 1036, 1044 (9th Cir.2004)). Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (citing Pegram v. Herdrich, 530 U.S. 211, 227, n.8 (2000)).

In determining whether to apply the doctrine, courts typically consider (1) whether a party's later position is `clearly inconsistent' with its original position; (2) whether the party has successfully persuaded the court of the earlier position, and (3) whether allowing the inconsistent position would allow the party to `derive an unfair advantage or impose an unfair detriment on the opposing party.' " United States v. Ibrahim, 522 F.3d 1003, 1009 (9th Cir.2008) (quoting New Hampshire v. Maine, 532 U.S. at 750-51, 121 S.Ct. 1808). (See also Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982) (whether the party has "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a latter proceeding would create `the perception that

either the first or the second court was misled") and In re Hoopai, 581 F.3d 1090, 1097 (9th Cir. 2009) (the court must consider whether the party against whom estoppel is sought would "derive an unfair advantage" if not estopped).

BPB's belated attempt to avoid its agreement with Debtor, its representations to Debtor, its representations to the state court, and its representations to this court, after receipt of substantial monies from Debtor and substantial financial expenditures by Debtor, warrants the application of judicial estoppel.

### L. Additional Nonbankruptcy Law Precludes Enforcement of BPB's Belated Claims for Default Interest and Late Fees.

In addition to the foregoing, the Court should also consider the tenets of contract law as applied to the loan agreement and Note. California law again governs. Del Hur, Inc. v. Nat'l Union Fire Ins. Co., 94 F.3d 548 (9th Cir. 1996). In California, a contractual clause is unenforceable if it is both procedurally and substantively unconscionable. Lona v. Citibank, N.A., 202 Cal. App. 4th 89, 109 (Cal. App. 6th Dist. 2011) (citing Armendariz v. Foundation Health Psychcare Services, Inc., 6 P.3d 669 (Cal. 2000)) (internal citations omitted). "Absent unusual circumstances, evidence that one party has overwhelming bargaining power, drafts the contract, and presents it on a take-it-or-leave-it basis is sufficient to demonstrate procedural unconscionability . . ." Id. (citing Gatton v. T-Mobile USA, Inc., 152 Cal. App. 4th 571 (Cal. App. 1st Dist. 2007)). Substantive unconscionability "consists of an allocation of risks or costs which is overly harsh or one-sided and is not justified by the circumstances in which the contract was made." Dean Witter Reynolds v. Superior Court, 211 Cal.App. 3d 758, 768 (Cal. App. 1st Dist. 1989). And while the determination of unconscionability is typically found in the context of standard form "adhesion" contracts, this is not a prerequisite for unconscionability. Harper v. Ultimo, 113 Cal. App. 4th 1402, 1409 (Cal. App. 4th Dist. 2003).

Applied here, BPB's attempt to belated backdate Debtor's payments, charge default interest and late fees, and bonus itself almost $500,000 after 2 1/4 years is unconscionable.

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 32 of 34

BPB's attempt is onerous and part of a strategy to punish Debtor notwithstanding Debtor rescued the real property from foreclosure, paid BPB approximately $912,680.90 to bring the loan current, reinstate the loan, and keep the loan current through regular monthly payments, paid substantial sums, including leasing commissions of $220,000 and environmental expenses to secure a tenant and a buyer, paid BPB $3,341,017.00 on November 8, 2013 as part of Debtor's sale of the real property, and paid substantial property taxes (approximately $247,595.95-approximately $50,000 more than when the Property was originally set to be sold in December 2012).

Because BPB's conduct was and is unconscionable and unenforceable, BPB should not be permitted to belatedly impose penalties such as additional principal, default interest and late fees, or backdate Debtor's prior payments. (*See* Restat 2d of Contracts, § 208 ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.").

### M. Breach of Duty of Good Faith and Fair Dealing Bars BPB's Attempt to Belatedly Backdate Debtor's Payments and Charge Default Interest and Late Fees.

Every contract implies on each contracting party a duty to exercise good faith and fair dealing in the performance and enforcement of a contract. Sutherland v. Barclays American/Mortgage Corp., 53 Cal. App. 4th 299, 314 (Cal. App. 2d Dist. 1997):

> . . . In general, the covenant imposes a duty upon a party to a contract not to deprive the other party of the benefits of the contract . . . The covenant . . . not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." Id. (*internal citations and quotations omitted*).

Here, BPB breached its duty of good faith and fair dealing. It changed its strategy for payoff or simply 'sandbagged' Debtor. Courts have noted that such remedies are warranted in

the instance of a contract which reflects, among other factors, "unequal bargaining strength between the parties, an inadequacy of ordinary contract damages or other remedies, adhesiveness of contract provisions adversely impacting the damaged party which are either neutral toward or benefit the other, public concerns that parties to certain types of contracts conduct themselves in a particular manner, the reasonable expectations of the parties or a fiduciary relationship in which the financial dependence or personal security by the damaged party has been entrusted to the other." Mitsui Mfrs. Bank v. Superior Court, 212 Cal. App. 3d 726, 731 (Cal. App. 4th Dist. 1989). The Court should not permit the inequitable award of backdated principal, default interest, and penalties to a party such as BPB who breached its duty of good faith and fair dealing.

### N. BPB Is Not Entitled To Backdated Default Interest and Late Fees.

Creditors may not receive both default interest and late charges under § 506(b). (In re Market Center East Retail Property, Inc.,433 B.R. 335, 365 (Bankr. D.N.M. 2010); In re Cliftondale Oaks, LLC, 357 B.R. 883, 887 (Bankr. N.D. Ga. 2006); In re Consolidated Properties Ltd. Partnership, 152 B.R. 452, 458 (Bankr. D. Md.1993); In re Kalian, 178 B.R. 308, 312 n. 9 (Bankr. D.R.I. 1995) (*citing cases*)). Such a rule exist because both are designed to compensate for the same injury, Cliftondale Oaks, supra, 357 B.R. at 887.

### O. Debtor Reserves the Right to Amend or Supplement this Objection.

Debtor reserve the right to amend or supplement this Objection as further information becomes known and available to Debtor

## IV. Conclusion.

For the foregoing reasons Debtor objects to the BPB Claim.

Dated: December 13, 2013          CAMPEAU GOODSELL SMITH
                                  /s/ William J. Healy
                                  William J. Healy

Case: 13-53491    Doc# 119    Filed: 12/13/13    Entered: 12/13/13 16:45:12    Page 34 of 34