1  CAMPEAU GOODSELL SMITH, L.C.
   SCOTT L. GOODSELL, #122223
2  WILLIAM J. HEALY, #146158
   440 N. 1st Street, Suite 100
3  San Jose, California   95112
   Telephone:   (408) 295-9555
4  Facsimile:   (408) 295-6606

5  ATTORNEYS FOR Debtor

6

7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  In re:                          )   Case No. 13-53491
                                    )
12  272 E SANTA CLARA GROCERY, LLC, )   CHAPTER 11
                                    )
13              Debtor.             )   **OBJECTION TO DISCLOSURE**
                                    )   **STATEMENT AND PLAN OF BOSTON**
14                                  )   **PRIVATE BANK & TRUST COMPANY**
                                    )   **DATED DECEMBER**
15                                  )   **5, 2013 (AS AMENDED JANUARY 17,**
                                    )   **2014)**
16                                  )
                                    )   **Date:  February 6, 2014**
17                                  )   **Time: 1:30 p.m.**
                                        **Place:**
18                                          **280 S. First Street, Crt. Room 3099**
                                            **San Jose, CA 95113**
19                                      **Judge: Hon. Stephen L. Johnson**

20
    _____ )
21

22  TO THE HONORABLE STEPHEN L. JOHNSON, UNITED STATES BANKRUPTCY

23  COURT JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; BOSTON

    PRIVATE BANK & TRUST COMPANY; and all other interested parties:
24
         COMES NOW, Debtor 272 E. Santa Clara Grocery, LLC ("Debtor") and objects to
25
    Boston Private Bank & Trust Company's ("BPB") Disclosure Statement (Docket#143)
26
    ("Disclosure Statement" or "DS")) and Plan of Reorganization (Docket#142) ("Plan") Dated
27
    December 5, 2013 (As Amended January 17, 2014) as follows:
28

---

**OBJECTION TO DISCLOSURE STATEMENT AND PLAN OF BOSTON PRIVATE BANK & TRUST COMPANY**
**DATED DECEMBER 5, 2013 (AS AMENDED JANUARY 17, 2014)**

## I. Preliminary Statement.

The Disclosure Statement and Plan are nothing more than a partial settlement offer to Debtor which purports to provide Debtor with nothing, bind non-parties and non-signators, require Debtor to defend, indemnify, and hold harmless BPB, including attorney's fees, from claims by non-parties and non-signators, and deny Debtor, Debtor's interest holders, Debtor's creditors, and non-parties a vote.

Debtor objects to the Disclosure Statement and Plan as it contains inadequate and inaccurate information, was not proposed in good faith, and is not confirmable.

## II. Requirements of A Disclosure Statement.

The purpose of a disclosure statement is to give all creditors and interest holders a source of information which allows them to make an *informed* choice regarding their approval or rejection of a proposed plan. (Duff v. United States Trustee (In re California Fidelity, Inc.), 198 B.R. 567, 571 (9th Cir. B.A.P. 1996)). Bankruptcy Code Section 1125 requires a plan proponent to provide impaired creditors and interest holders with a written disclosure statement which provides adequate information regarding the proposed plan. A disclosure statement must set forth the *factual basis* for each opinion or prediction. (In re Neutgens,  (Bankr. D. Mont. 1987) 87 B.R. 128, 129-30).

Where a plan is not confirmable, the proposed disclosure statement should be disapproved. *(*See, e.g., In re 266 Washington Assocs.*,* 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y. 1992)). In order to be confirmed, a plan must be proposed in good faith. (11 U.S.C. § 1129(a)(3)).

## III. The Disclosure Statement and Plan Attempt to Settle Claims Held By Third Parties and Force Debtor To Indemnify BPB from Claims By Third Parties All While Denying Everyone Except BPB A Vote.

The Disclosure Statement and Plan are presented as a settlement offer by BPB to resolve various claims Debtor has asserted against BPB. However, the settlement offer is much more and is fatally flawed.

The settlement offer purports to offer Debtor no cash and a belated credit against its

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 2 of 16

disputed claim, but simultaneously requires Debtor and third parties to release claims against BPB and requires Debtor to defend and indemnify BPB from any claims asserted by any parties against BPB–all without signatures on the agreement, notice to the third parties, consideration, or court approval of the agreement-for a $25,000 belated credit against its claim.

Noticeably absent from the Disclosure Statement and Plan is any legal authority supporting the concept of resolving Debtor's affirmative claims through a plan or any legal authority supporting the concept that a settlement proposal to the Debtor can bind third parties and non-parties who are not signators to the proposed agreement and who did not receive any consideration.

Also noticeably absent from the Disclosure Statement and Plan are any discussions regarding who are the parties to the agreement beyond Debtor and BPB, whether Debtor, Debtor's members, or the others get to see, review, and approve the agreement, whether the court needs to approve it, who are Debtor's known predecessors, who are Debtor's unknown predecessors, how third parties can be bound to a agreement when they are unknown, when they are not signatories, and when they do not receive consideration, the nature and extent of the claims by these third parties, and whether BPB did, in fact, knowingly and willfully withhold material information from Debtor and others. Presumably, hypothetical reasonable investors would like to know this information.

Although there is a proposed release attached to the Plan, it does not attempt to identify signators, and is fatally defective in numerous other areas. The proposed release falsely asserts that Debtor has represented it owns all claims. Debtor has simply asserted that the prior fractional owners of the real property assigned/transferred their interest in the real property to the Debtor and Debtor believes that it holds claims against BPB. Debtor has never represented that claims of Investment Grade Loans, Inc. ("IGL") and others are owned by Debtor. For example, the Agreement Re Foreclosure Sale, Second Amendment to Agreement Re Foreclosure Sale, and Third Amendment to Agreement Re Foreclosure Sale

OBJECTION TO DISCLOSURE STATEMENT AND PLAN OF BOSTON PRIVATE BANK & TRUST COMPANY
DATED DECEMBER 5, 2013 (AS AMENDED JANUARY 17, 2014)
3

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 3 of 16

are signed by Investment Grade Loans, Inc. ("IGL")[1]. IGL was not a fractional owner of the subject real property and therefore did not assign any fractional ownership of the real property to the Debtor. Therefore, Debtor would not make the representation contained in section 2 of the agreement or indemnify, defend, or hold harmless BPB from claims asserted by IGL or others.

The proposed release also purports to have Debtor release claims relating to "any of BPB's lending practices, procedures, or conduct in connection with its loan" and then indemnify, defend, or hold harmless BPB from such claims. Debtor is not in a position to have information relative to such claims, would not release such claims or indemnify, defend, or hold harmless BPB from such claims whether made by its borrower Kimomex or others, and would certainly not do so without consideration. Debtor submits that the proposed discount represents less than a 5% discount on its claim[2].

**IV. The Disclosure Statement and Plan Incorrectly Assert That BPB is Impaired And Others Are Not.**

The Disclosure Statement and Plan assert that BPB's claim will be paid in full and BPB's claim and the claims of all creditors will be paid in full. Pursuant to the Disclosure Statement and Plan BPB rights and remedies remains unchanged. Therefore, BPB is not impaired and not entitled to vote.

To the extent BPB contends that it is impaired because it has to wait for payment--on its disputed claim-- then the same alleged impairment applies to all creditors–claims that are not undisputed and not subject to objections. The Disclosure Statement and Plan provide that payments to creditors will not occur until the effective date which is defined as the later of confirmation or a final order on the objection to BPB's claim. Therefore, the Plan provides

---

[1]Debtor also signed the Third Amendment and the agreement references the prior agreements.

[2]The Disclosure Statement briefly references the potential value of Debtor's claims against BPB. While such has not been formally quantified Debtor anticipates that the value of the 'non-disclosure' claim alone, which relates to multiple and continued non-disclosures by BPB between July 2011 and December 2012, may exceed $1,000,000 by way, in part, of the difference between what Debtor believed it was purchasing and what it actually received.

OBJECTION TO DISCLOSURE STATEMENT AND PLAN OF BOSTON PRIVATE BANK & TRUST COMPANY
DATED DECEMBER 5, 2013 (AS AMENDED JANUARY 17, 2014)
4

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 4 of 16

that all creditors are paid in full at the same time. Accordingly, BPB is not impaired.

In addition, the Disclosure Statement and Plan incorrectly assert that the rights of Debtor's members are not impaired. The rights and interests of Debtor's members are impaired and diluted because the value of their respective interests are summarily reduced and their right to vote summarily denied. Such alteration impairs their rights. (In re L & J Anaheim Assoc. (9ᵗʰ Cir. 1983) 995 F.2d 940, 943)(11 U.S.C. 1123 9a)(6) and 1126 (a), ©, (d), and (f), & (g).)

**V. The Disclosure Statement and Plan Falsely State The Amount Debtor Already Paid BPB.**

The Disclosure Statement and Plan falsely state that Debtor paid BPB $3,241,017.20. Debtor paid BPB, consistent with all state court and bankruptcy court declarations and pleadings filed by BPB prior to its Proof of Claim and with the order approving Debtor's sale of property, $3,341,017.20-----that's $100,000 more than asserted in the Disclosure Statement and Plan.

**VI. The Plan Is Inconsistent With BPB's Position Relative To Adequate Protection.**

The Plan contends that the Debtor has almost triple the amount needed to satisfy all the payments required under its plan and it is confident Debtor will have more the sufficient cash on hand to make all required plan payments on the effective date of the plan. While Debtor generally agrees with this assertion, it is inconsistent with BPB's recent assertion that its position may not be adequately protected (Docket#105, page 2, lines 14-15 and page 10, lines 3-5).

**VII. The Plan Provides Inconsistent Positions Relative to Disbursements and Unclaimed Distributions.**

Section 6.2.4 of the Plan provides that checks issued by the Debtor to pay allowed claims shall be null and void if not negotiated within 60 days and the claim is deemed disallowed after 120 days. However, Sections 6.5.1 and 6.5.2 of the Plan require Debtor to hold unclaimed distributions for 90 days and that the claimant's rights to such payment is lost after 90 days. These sections are inconsistent and incompatible.

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 5 of 16

**VIII. The Disclosure Statement and Plan Ignore Debtor's State Law Claims Against Others.**

The Disclosure Statement and Plan do not reference or mention Debtor's state law claims against parties other than BPB although such claims are listed in Debtor's Schedule B. While the Plan indicates that such property may revest to the Debtor such claims are not identified in the Disclosure Statement of Plan and are not specifically excluded from BPB's proposed settlement agreement. Debtor asserts rights to these claims. Any disclosure statement or plan must confirm that Debtor asserts rights to these claims and such are excluded from any proposed settlement agreement with BPB.

**IX.      The Disclosure Statement and Plan Contain Wholly Inadequate, One-Sided, and Inaccurate Information**.

**A. The Disclosure Statement Contains Inaccurate Information.**

The Disclosure Statement contains inaccurate information some, but not all of which, are worth noting. Some examples include: "Debtor's ongoing expenses solely relate to the expenses associated with administering its estate, including fees and costs to be incurred in connection with resolving BPB's claim and prosecuting its alleged claims against BPB" (DS, page 2, lines8-10); "Debtor's claims against BPB arise from its assertion that BPB purportedly had knowledge of alleged environmental conditions relating to the Property, allegedly failed to disclosure such conditions to Debtor prior to its foreclosure on the Property . . ." (DS, page 2, lines 10-15); "the Junior Lenders' representative and BPB expressly agreed that defaults under the loan were not cured" (DS, page 10, lines 1-2) "BPB has had no other agreements whatsoever with the Junior Lenders, their representative or the Debtor" (DS, page 9, lines 27-28); and "Debtor's representative was obstreperous and threatening, admitted having no experience or funds to deal with the environmental issues that allegedly existed on the Property . . . diverted rents being generated from the Property to his own pocket . . ." (DS, page 10, lines 15-22)[3].

---

[3]The page references are to the prior Disclosure Statement and Plan, but do not appear to have

(continued...)

OBJECTION TO DISCLOSURE STATEMENT AND PLAN OF BOSTON PRIVATE BANK & TRUST COMPANY
DATED DECEMBER 5, 2013 (AS AMENDED JANUARY 17, 2014)

6

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 6 of 16

1    These statements are simply inaccurate. First, Debtor has claims set forth in its

2    schedule that do not include BPB, namely claims against Chevron and others relative to the

3    environmental issues with the Property and an active lawsuit against the guarantors of a loan.

4    Debtor intends to prosecute these claims. Second, Debtor's claims against BPB are not

5    limited to those defined by BPB. As set forth in Debtor's objection to BPB's claim Debtor

6    asserts many factual and legal claims against BPB, including claims that BPB knowingly

7    failed to disclose environmental issues with the Property prior to, during, and after

8    foreclosure, payment of substantial monies to BPB, expenditures of substantial funds relative

9    to the Property, and execution of three agreements and negotiation of a fourth, and then

10   improperly backdated payments and charged default interest and late fees contrary to

11   representations to Debtor, agreements with Debtor, sworn declaration and pleadings filed in

12   the State Court, and sworn declarations and pleadings in this court.  Third, the loan was

13   brought current in July 2011 and kept current from July 2011 through April/May 2013 when

14   BPB intercepted rent payments and prevented Debtor from making regular monthly payments

15   to BPB. Fourth, there are agreements with BPB beyond those summarily stated in the

16   Disclosure Statement and such are described in Debtor's objection to BPB's claim and

17   reflected in part by the representations made by BPB, the written agreements prepared by and

18   signed by BPB, BPB's acceptance of substantial funds from July 2011 through at least March

19   2013, and in BPB's sworn declarations and pleadings filed in the State Court and with this

20   court. Fifth, Debtor denies BPB's self-serving description of communications with Debtor's

21   representative, the existence of and funds and experience relative to environmental issues,

22   and any allegation that Debtor's representative diverted rent to his own pocket.

23       **B. The Disclosure Statement's One-Sided Presentation Omits Material Facts.**

24       The Disclosure Statement omits material facts inconsistent with BPB's self-serving

25   history (also in the section entitled "Major Events In Chapter 11 Case") which should be

26

27   [3](...continued)

28   been deleted in the amended versions.

**OBJECTION TO DISCLOSURE STATEMENT AND PLAN OF BOSTON PRIVATE BANK & TRUST COMPANY**
**DATED DECEMBER 5, 2013 (AS AMENDED JANUARY 17, 2014)**
7

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 7 of
16

disclosed. Some examples of facts omitted from BPB's one-sided presentation include[4]:

On July 15, 2011 BPB and IGL entered into an "Agreement Re Foreclosure Sale" (the "Foreclosure Agreement") by which BPB agreed that if IGL immediately paid $380,661.90 to cure the arrearage BPB would postpone the trustee's sale to after August 17, 2011 and that if IGL made "the regular monthly payment of $24,307.45 due under the Loan" to keep the loan current, then BPB would continuously postpone the trustee's sale through March 16, 2012. The Foreclosure Agreement also provided that the $380,661.90 sum shall be applied to payments of principal and interest now due, together with certain trustee's fees, attorneys' fees and other costs owing to Borel as of the date of this Agreement . . ." On July 18, 2001, pursuant to the Foreclosure Agreement, IGL paid BPB $380,661.90 to reinstate and bring the loan current. The Foreclosure Agreement acknowledged the Second DOT and at all times related to the Foreclosure Agreement and thereafter BPB was aware of the Second DOT.

On June 30, 2011, prior to the Foreclosure Agreement, BPB's agent PLM Lender Services, Inc. ("PLM"), provided IGL with a reinstatement letter dated June 29, 2011 which indicated, in part, the amounts necessary to reinstate the loan through July 15, 2011 and specified a principal balance of $3,487,501.16. Debtor negotiated the reinstatement and cure amount of $380,661.90 directly with Bruce Brown of BPB and based those negotiations and many factors, including the asserted principal balance of $3,487,501.16, that the regular monthly payment was $24,307.45, that the regular monthly payment consisted of principal and interest at 6.5%, that the regular monthly payment of $24,307.45 would keep the loan current, and without knowledge of any environmental issues with the Property.

---

[4]Debtor submits these omitted facts, which are part of Debtor's objection to BPB's claim, are either subject to judicial notice or supported by a declaration based on personal knowledge.

OBJECTION TO DISCLOSURE STATEMENT AND PLAN OF BOSTON PRIVATE BANK & TRUST COMPANY
DATED DECEMBER 5, 2013 (AS AMENDED JANUARY 17, 2014)

8

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 8 of 16

In June 2011 IGL recorded a notice of default under the Second DOT. The foreclosure took place on October 24, 2011. At the time of the foreclosure, the building was empty, there was no tenant, and there was no rental income. BPB was promptly made aware of the foreclosure on the Second DOT.

Between October 2011 and March 2012 BPB was paid its regularly monthly payment of $24,307.45 per month to keep the loan current.

In November 2011 and January 2012, IGL and BPB entered into a "First Amendment" and a "Second Amendment to Agreement Re Foreclosure Sale" (the "Second Amendment"). Under the Second Amendment the parties agreed that if IGL made "the regular monthly payments" for December 2011 through March 2012 of $24,307.45 to keep the loan current then BPB would postpone the foreclosure sale Debtor negotiated these amendments directly with Bruce Brown of BPB.

BPB was promptly made aware of the transfer of the Investor's interest to the Debtor and such is reflected in the Fourth Amendment discussed hereinafter.

In March 2012, BPB, IGL, and Debtor entered into a "Third Amendment to Agreement Re Foreclosure Sale" (the "Third Amendment"). Under the Third Amendment, the parties agreed that if BPB was paid "the regular monthly payment of $24,307.45 due under the Loan" to keep the loan current then BPB would postpone the trustee's sale through December 31, 2012. The parties further agreed that Plaintiff and Debtor would enter into a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") under which BPB would not disturb the tenant's possession in the event BPB foreclosed, which SNDA was signed on July 26, 2012. The Third Amendment was negotiated with Bruce Brown on behalf of BPB.

In reliance upon the multiple agreements with BPB, Debtor continued to pay BPB $24,307.45 per month through and including March 2013 to keep the loan current. Thus, from July 2011 through March 2013, Debtor paid Plaintiff $380,661.90 to cure the arrearage and bring the loan current, plus approximately $413,219 in

monthly payments for a total of $793,880.90 to keep the loan current. This is in addition to the approximate $242,000 for leasing commissions spent to find a tenant. Thus, a total of approximately $1,033,880 was spent in reliance upon the agreements with BPB. The Third Amendment indicated a principal balance on the loan of $3,460,917.00.

IGL and Debtor would not have foreclosed on its Second DOT, entered into the Foreclosure Agreement or subsequent amendments, paid the agreed reinstatement and cure monies of $380,661.90 to bring the loan current, or paid the regular monthly payments of $24,307.45 to keep the loan current had the principal balance not been $3,487,501.16, had the payment of $380,661.90 and the regular monthly payment of $24,307.45 not cured, reinstated, and kept the loan current, had the regular monthly payments of $24,307.45 not been based on interest at 6.5% and been applied to both principal and interest, had Debtor been advised by BPB of the environmental issues with the Property, and had I been advised by BPB that it may attempt to assert any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs.

In November 2012, Debtor found a buyer and entered into a contract for the sale of the Property for $7.3 million dollars. The escrow was scheduled to close in December 2012. This sale would have paid off BPB's lien. However, during their due diligence, the buyer discovered that the Property was listed with the State and/or County as undergoing clean-up or investigation due to a possible leak from an old underground storage tank. Specifically, while conducting a Phase I, Environmental Investigation, the buyer discovered the existence of prior reports filed showing that the Property was contaminated. As a result of the discovery, the buyer cancelled the sale. This discovery by the buyer was the first notice that Debtor had of any contamination on the Property. However, Debtor was informed that BPB had been aware of the contamination since 2008, had a copy of a report showing purported

contamination, and never disclosed the report or the purported contamination to Debtor. Had BPB disclosed this information to Debtor, Debtor would not have paid BPB $793,880 to cure the default, made the regular monthly payments under the First DOT to keep the loan current, or invested another $242,000 in leasing commissions to find a tenant. In addition, had BPB disclosed this information, not affirmatively acknowledged the declining principal ($3,460,917.00 in the Third Agreement), not reinstated or treated the loan as current, not based the regular monthly payment of $24,307.45 on 6.5% and applied such payments to interest and principal, or asserted any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs then IGL and Debtor would not have entered into the Foreclosure Agreement or taken any of the actions described herein.

Debtor continued to make the regular monthly payments of $24,307.45 to BPB through March 2013 to keep the loan current. Around that time, BPB, IGL and Debtor negotiated the terms for a fourth amendment regarding the foreclosure sale. Under the terms as negotiated, Plaintiff agreed that so long as Debtor and IGL took certain steps to obtain a "closure and/or no further action letter" regarding the contamination from the required regulatory agency, and to the extent required, pay for any additional environmental investigation, testing, remediation and/or other work, kept BPB apprised of the progress, and obtained a "closure and/or no further action letter" resolving all environmental issues no later than April 30, 2014, then no monthly payments after March 2013 would be due, and the foreclosure sale would be continued through April 30, 2014. Debtor negotiated this amendment directly with Bruce Brown of BPB.

In reliance upon the agreement that no payments were due after March 2013, Debtor did not make payments pending the drafting and execution of the fourth amendment. The draft fourth amendment was not received until May 2013. Consistent with the negotiations, the draft fourth amendment stated that no payments would be

due after March 2013. However, contrary to prior discussions, the proposed "Fourth Amendment to Agreement Re Foreclosure Sale" (the "Fourth Amendment"), required Debtor, IGL, and their predecessors to release BPB from any claims relating to the Property including any environmental issues. As BPB had failed to disclose the environmental contamination to Debtor prior to and during its dealings and did not know the severity of the contamination and cost of remediation, Debtor refused to execute the Fourth Amendment. The Fourth Amendment, prepared by BPB and presented to Debtor for signature, indicated a principal balance on the loan of $3,341,017.00.

In late January or early February 2013 Debtor contacted BPB because Debtor needed payment information for its tax returns and had not received a 1098 or similar form from BPB. On February 4, 2013 Debtor received a facsimile from BPB consisting of a payment history on the loan. The payment history reflects a payment history for 12/27/11 through 12/31/12, a principal balance of $3,460,916.67, regular monthly payments of $24,307.45, but an allocation of the payment only to interest and at 8%. Therefore, Debtor contacted Bruce Brown of BPB, indicated that the payment history was incorrect in terms of the interest rate and application of the regular monthly payment to interest and principal, and asked that the errors be corrected immediately and made consistent with our agreement that the loan was brought current and kept current by the prior payments so Debtor could prepare its tax returns. BPB agreed to correct the errors.

On February 25, 2013 Bruce Brown of BPB emailed an adjusted amortization schedule which referenced the loan, the payment history from July 19, 2011 through February 15, 2013, the interest rate at 6.5%, the regular monthly payment of $24,307.45, the application of the regular monthly payment to principal and interest at 6.5%, a declining principal balance, and a principal balance of $3,347,194.03. Debtor secured this amortization schedule from BPB for its 2012 taxes, reasonably relied

upon this information, and used this information for its 2012 tax returns.

On or about May 17, 2013 BPB served a "Demand That You Pay Rent To A Party Other Than The Landlord" on the tenant. Debtor received confirmation that the tenant would comply with the demand and pay all rents directly to BPB. In compliance with the demand and commencing June 2013, BPB received and continued to receive all the rent, i.e. $39,600, directly from the tenant (this rent was about $15,300 more than the regular monthly payment). Pre-petition Debtor tendered, and continued to tender, immediate payment of the total arrearage, thereby bringing and maintaining the loan current. BPB wrongfully rejected this tender.

On June 10, 2013, BPB filed a Verified Complaint For (1) Judicial Foreclosure; And (2) Specific Performance And Appointment of Receiver commencing a state court action against Kimomex and Debtor, Santa Clara County Superior Action No.: 1-13-CV-247961 ("State Court Action") and wherein BPB, under penalty of perjury, repeatedly asserted "As of June 10, 2013, there is due, owing and outstanding under the Promissory Note the principal amount of $3,341,017.20 . . .". Although the State Court Action does not acknowledge the prior agreements and prior payments, it does not assert or quantify any claim for default interest.  This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor reasonably relied upon this information.

On July 12, 2013, BPB, through David Scheiber, Senior Vice President-Special Assets Department of BPB, filed a declaration, under penalty of perjury, and asserted that the outstanding balance due and owing by Debtor to BPB on the First DOT as of June 27, 2013 totaled $3,341,017.20. Specifically, BPB asserted "As of June 27, 2013, the outstanding principal balance due and owing from Kimomex under the Promissory Note and other Loan Documents is $3,341,017.20 . . ." ("Scheiber

Case: 13-53491    Doc# 150    Filed: 01/30/14    Entered: 01/30/14 15:19:05    Page 13 of
16

Declaration")(Doc#22-2[5], entered July 12, 2013, page 3, paragraph 7)

On July 30, 2013 BPB filed a Reply in Support of its Ex Parte Applications for Orders of Examination and for Production of Documents Pursuant to Bankruptcy Rule 2004, in support of numerous 2004 applications (Doc#31-36 and 41) asserting "BPB holds the senior lien on the Property securing a loan with an outstanding principal balance of $3,341,017.20". (Doc#42, entered July 30, 2013, page 3, lines 7-8) At the same time BPB also re-filed the Scheiber Declaration to support the alleged principal balance of $3,341,017.20. (Doc#31-3, entered July 30, 2013, page 3, paragraph 7)

On August 12, 2013 BPB filed an additional 2004 application and asserted "BPB holds the senior lien on the Property securing a loan with an outstanding principal balance of $3,341,017.20. (Counsel Decl. Exh. 1 ("Scheiber Declaration"), at ¶7.)" (Doc#45, page 2, paragraph 3)

On August 14, 2013 BPB filed Secured Creditor Boston Private Bank & Trust Company's Opposition to Debtor's Cross Motion for Use of Cash Collateral and asserted "As of the Petition Date, the outstanding principal balance due and owing from Kimomex to BPB under the Note and other Loan Documents was $3,341,017.20 . . ." (Doc#50, page 4, lines 6-9).

On October 15, 2013 BPB filed a Declaration of Counsel In Support of Opposition to Ex Parte Application For Order Directing Boston Private Bank & Trust Company's Production of Documents Under Bankruptcy Rule 2004 and asserted "BPB holds the senior lien on the certain leased real property located at 272 E. Santa Clara Street, San Jose, Ca. (the "Property") securing a loan with an outstanding principal balance of $3,341,017.20". (Doc#51, page 5, lines 3-5)

BPB consistently provided Debtor with confirmation of the principal amount owed under the loan and First DOT upon which Debtor relied. Debtor would not have

---

[5]The court may take judicial notice of its own files pursuant to Federal Rules of Evidence 201 and such files are referred to herein as "Doc", meaning Docket, and corresponding Docket number

pursued foreclosure of its Second DOT, the various agreements with BPB, secured a tenant, or paid BPB and various related expenses totaling approximately $1,033,880 ($380,661.90 to BPB to cure and reinstate the loan, $242,000 in leasing commissions, and $413,219 to BPB ($24,307.45 from July 2011-March 2013) for regular monthly payments of principal and interest to keep the loan current if the principal was not as represented by BPB. Debtor rightfully relied upon BPB's representations of principal as reflected in its June 2011 reinstatement letter (principal $3,487,501.16), in the March 2012 BPB Third Amendment (principal $3,460,917.00), its February 2013 Amortization Schedule (principal $3,347,194.03), and in the March 2013 Fourth Amendment (principal $3,341,017.00).

Just as Debtor moved to sell the Property BPB filed the BPB Claim and asserted, contrary to all prior declarations and documents, that "As of the petition date, the outstanding principal due and owing from Kimomex under the Promissory Note and other Loan Documents is $3,555,168.55. (Proof of Claim No. 2, page 5) Suddenly, as Debtor moves to sell the Property, a $214,151.35  ($3,555,168.55- $3,341,017.00) difference in the claimed principal arises and said difference is reflected between BPB's agreements with Debtor, the Verified Complaint in the State Court Action, and repeatedly filed declarations and representations made in this bankruptcy case on the one hand and the BPB Claim on the other hand.

**XI. The Disclosure Statement and Plan Were Not Proposed In Good Faith or Fair And Reasonable and The Plan Is Not Confirmable.**

Pursuant to 11 U.S.C. 1129 a plan must be, inter alia, fair and reasonable and proposed in good faith and where a plan is not confirmable, the proposed disclosure statement should be disapproved. (See, e.g., In re 266 Washington Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992))

The Disclosure Statement and Plan presented by BPB are not fair and reasonable or presented in good faith. In their simplest forms, the Disclosure Statement and Plan purport to

allow BPB to vote on its own plan, consider itself impaired yet get paid in full, consider all others unimpaired and without a vote yet somehow sacrifice claims against BPB, and settle claims against it without any payment of cash and a belated credit. BPB accomplishes all of this in exchange for a small belated credit, a unilateral (non-mutual) release and indemnity obligation, and release of claims of third parties without the benefit of the third parties seeing the agreement, approving the agreement, signing the agreement, and receiving consideration for the agreement. This kind of unfair discrimination precludes plan confirmation. 11 U.S.C. § 1129(b).

As previously stated Debtor's interest and the interests of its members are diluted and impaired by the Plan because the value of their respective interests are summarily reduced and their right to vote summarily denied. Such alteration impairs their rights. (In re L & J Anaheim Assoc. (9th Cir. 1983) 995 F.2d 940, 943)(11 U.S.C. 1123 9a)(6) and 1126 (a), ©, (d), and (f), & (g).)

Furthermore, in order to be "fair and reasonable", a plan must provide either that each unsecured claimant receive or retain property equal to the amount of his claim or that no claimant junior to such claimant receive any property. Here, the Plan proposes to summarily dilute the interests of Debtor and Debtor's members and therefore flagrantly violates Section 1129.

In addition, the Plan violates 11 U.S.C. 524 as the purported 'general release' proposed by BPB includes parties other than Debtor and then requires Debtor to make incorrect representations and defend, indemnify, and hold harmless BPB for claims by others

**VI. Conclusion.**

For the foregoing reasons Debtor objects to the BPB Claim, submits the disclosure statement cannot be approved, and the plan is not confirmable.

Dated: January 30, 2014              CAMPEAU GOODSELL SMITH
                                     /s/ William J. Healy
                                     William J. Healy

OBJECTION TO DISCLOSURE STATEMENT AND PLAN OF BOSTON PRIVATE BANK & TRUST COMPANY
DATED DECEMBER 5, 2013 (AS AMENDED JANUARY 17, 2014)
16

Case: 13-53491   Doc# 150   Filed: 01/30/14   Entered: 01/30/14 15:19:05   Page 16 of 16