CAMPEAU GOODSELL SMITH, L.C.
SCOTT L. GOODSELL, #122223
WILLIAM J. HEALY, #146158
440 N. 1st Street, Suite 100
San Jose, California 95112
Telephone: (408) 295-9555
Facsimile: (408) 295-6606

ATTORNEYS FOR Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re: ) Case No. 13-53491
)
272 E SANTA CLARA GROCERY, LLC, ) CHAPTER 11
)
          Debtor. ) **DECLARATION OF THOMAS RANCATORE**
)

I, Thomas Rancatore, do hereby declare:

1. I am, and at all times herein referenced herein was, over the age of eighteen.

2. I submit this declaration relative to 272 E. Santa Clara Grocery, LLC's ("Debtor") objection to the Proof of Claim filed by Boston Private Bank & Trust Company ("BPB") who I understand is the successor to Borel Bank.

3. I submit this declaration of my own personal knowledge based on my personal involvement in a loan to Kimomex Santa Clara, LLC ("Kimomex") by various investors of IGL and brokered and serviced by IGL, foreclosure of the associated deed of trust with Kimomex relative to real property commonly known as 272 E. Santa Clara Street, San Jose, California ("the Property"), IGL's and Debtor's transactions and dealings with BPB relative

to BPB's loan and deed of trust to Kimomex relative to the Property, BPB's notice of default and notice of trustee's sale relative to BPB's loan and deed of trust to Kimomex relative to the Property, payments to BPB relative to BPB's loan to Kimomex, the foreclosure by IGL of the deed of trust associated with the Property, creation of Debtor, transfer of interests in the Property from IGL's investors to Debtor, Debtor's efforts to secure a tenant for the Property, Debtor's efforts to sell The Property, the bankruptcy of Debtor, the sale of the Property, and Debtor's tax returns. In this regard, I was and am readily familiar with process by which IGL and Debtor maintained its files, books, and records, with IGL's and Debtor's files, books, and records and IGL's files, books and records as they relate to each of the above-listed areas, know the documents attached hereto were placed into the files, books, and records of IGL and Debtor at or near the time they were received or generated, and became part of the files, books, and records IGL and Debtor consistent with the regularly business activities of IGL and Debtor.

4. Only true and correct copies of the referenced exhibits are attached hereto. Except as noted herein the referenced exhibits are from IGL's and Debtor's files, books, and records. I understand the attached exhibits are also listed exhibits in Debtor's Trial Exhibit List and therefore this declaration references and uses those exhibit letters/numbers.

5. I hold a Bachelor's degree. I have been licensed as a Certified Public Accountant ("CPA") since 1982. Prior to employment at Investment Grade Loans, Inc. ("IGL" or "IGLI") I worked approximately four years as a government auditor, approximately four years for a start-up, and approximately fourteen years for a real estate syndicator.

6. I worked for IGL from approximately March 2000 through November 2013 at which time I retired. My title at IGL was Chief Financial Officer. My general duties at IGL included, but were not limited to, anything related to accounting, preparing operating agreements for new business deals, preparing loan documents including promissory notes, deeds of trust, and related documents, preparing lender documents for IGL's investors, including disclosures, loan servicing, and preparation of tax returns for IGL and entities used for various business deals. I also communicated with IGL's borrowers and IGL's investors.

My duties at IGL included various similar actions on behalf of the Debtor and included assisting Debtor and Debtor's manager Andrew Lewis with various bankruptcy filings and other matters. During my employment at IGL and relative to work for the Debtor, I generally reported to, took direction from, and assisted Andrew Lewis who, at all times relevant, was the president of IGL and manager of Debtor. As a result of my years of employment and duties at IGL and on behalf of Debtor I became familiar with and am familiar with the signature of Andrew Lewis.

7. In May 2009, several investors (collectively the "Investors") loaned $635,000 to Kimomex Santa Clara, LLC ("Kimomex") ("IGL Note") secured by a deed of trust in second position ("Second DOT") against the Property and with IGL as trustee. The Second DOT was subject to an existing first deed of trust in the amount of approximately $3.6 million dollars recorded in July 2008 in favor of BPB formerly known as Borel Private Bank & Trust Company) ("First DOT") and related to a loan by BPB to Kimomex ("BPB Loan"). In this regard I prepared the loan documents for IGL's loan to Kimomex, including the IGL Note and Second DOT based on the information provided to and made available to IGL.

8. In approximately May 2009 and prior to execution of the IGL Note and Second Deed of Trust I prepared an Investment Overview for IGL's analysis and for the Investor's benefit based on information provided to and made available to IGL. The Investment Overview is signed by Andrew Lewis on behalf of IGL. The Investment Overview notes certain information which IGL and the Investors may consider before proceeding with the business opportunity, including our understanding of the prior encumbrance. The Investment Overview notes, under "Prior Encumbrances" that Kimomex's monthly payment to BPB under BPB's loan to Kimomex and First DOT was $24,307.00, the interest rate was 6.5%, the present balance was $3,555,168.55. The "Equity Analysis", Disclosure Statement Summary, Part 9 Encumbrance Information, and Part 10 Loan to Value Ratio sections of the Investment Overview also note the present balanced owed by Kimomex to BPB was $3,555,168.55). See Debtor's Trial Exhibit A.

9. In approximately June 2011 IGL recorded a notice of default under the Second DOT because Kimomex defaulted on the IGL Note.

10. In approximately June 2011, IGL received a copy of a Notice of Trustee's Sale whereby BPB, through its trustee PLM Lender Services, Inc. (PLM Lender") gave notice of its intent to foreclose on the First DOT. The Notice of Trustee's Sale is dated June 23, 2011 and provides that the unpaid balance and other charges was estimated at $3,868,163.06. See Debtor's Trial Exhibit C.

11. On June 30, 2011, prior to the Foreclosure Agreement described below, IGL was provided a reinstatement letter dated June 29, 2011 by PLM Lender Services, Inc. ("PLM"), trustee of the First DOT, which indicated, in part, the amounts necessary to reinstate the loan through July 15, 2011 at $386,080.68 (delinquent payments of $340,304.30 and miscellaneous fees) and specified a principal balance of $3,487,501.16. See Debtor's Trial Exhibit D.

12. On July 15, 2011, prior to the sale date, BPB and IGL entered into an "Agreement Re Foreclosure Sale" (the "Foreclosure Agreement"). Mr. Lewis negotiated the reinstatement and cure amount of $380,661.90 directly with Bruce Brown of BPB. My involvement with the Foreclosure Agreement was to exchange signature pages with BPB and have $380,661.90 paid to BPB as directed by Andrew Lewis. Upon receipt of Mr. Lewis' signature page on the Foreclosure Agreement, I forwarded a copy to Bruce Brown of BPB and on July 18, 2011 wired $380,661.90 to BPB as directed by Andrew Lewis. See Debtor's Trial Exhibits G and H.

13. The foreclosure sale on the Second DOT took place on October 24, 2011. At the sale the Investors bid $100,000, which was the highest bid, and became the owners of the Property. The sale resulted in a deficiency balance due on the IGL Loan of $1,083,908.74. On October 27, 2011 I prepared and signed on behalf of IGL as trustee a Trustee's Deed noting the debt balance, bid amount, and other information and wherein the Investors granted their interest in the Property to Debtor. Andy Lewis also signed the Trustee's Deed. The Trustee's Deed was recorded with the Santa Clara County Recorder on April 20, 2012 as Document#21633290). See Debtor's Trial Exhibit J.

14. At the time of the foreclosure of the Second DOT, it was my understanding that the building on the Property was empty, there was no tenant, and there was no rental income.

15. In January 2012 BPB, IGL, and Debtor entered into a Second Amendment to Agreement. My involvement with the Second Amendment to Agreement was to exchange signature pages with BPB and have $48,614.90 (for the December 2011 and January 2012 payments) sent to BPB so they were considered timely. Upon receipt of Mr. Lewis' signature page on the Second Amendment to Agreement, I forwarded a copy to Bruce Brown of BPB, wired $48,614.90 to BPB, and received confirmation of same from Bruce Brown of BPB. See Debtor's Trial Exhibit L.

16. Between October 2011 and March 2012, the Investors and the Debtor marketed the Property for lease to potential tenants, found a tenant in March 2012, entered into a lease on March 8, 2012, and eventually paid $242,000 in leasing commissions as part of securing the tenant at the Property.

17. Between October 2011 and March 2012 was paying BPB its regularly monthly payment of $24,307.45 per month to keep the loan current.

18. In March 2012, the Investors formed 272 E Santa Clara Grocery, LLC ("Debtor") and by way of a Grant Deed deeded their respective ownership interests in the Property to the Debtor. The Grant Deed was recorded in April 2012. I prepared the operating agreement and Grant Deed and secured signatures from the Investors and Andrew Lewis as declarant for the Grant Deed. See Debtor's Trial Exhibit O.

19. On June 25, 2012, on behalf of IGL and Debtor, I sent the Investors correspondence updating them on matters relating to the IGL Loan, Second DOT, BPB, and the Property and to make a cash call for additional monies to fund related expenditures. See Debtor's Trial Exhibit Q. The correspondence indicates, in relevant part, that BPB is owed approximately $3,400,000,00—a figure based on Debtor's files, books, and records regarding the amounts paid to BPB on the BPB Loan, including the amount of interest paid to BPB on the BPB during 2012 and the outstanding principal balance of the BPB Loan. I believe one of the Investors (Ogen Perry) responded by loaning Debtor monies.

20. Debtor continued to pay BPB $24,307.45 per month through and including March 2013. Thus, from July 2011 through March 2013, Debtor paid Plaintiff $380,661.90 to cure the arrearage and bring the loan current, plus approximately $413,219 in monthly payments for a total of $793,880.90 to keep the loan current. This is in addition to the approximate $242,000 for leasing commissions spent to find a tenant. Thus, a total of approximately $1,035,880 was spent relative to this matter.

21. In late January or early February 2013 Debtor needed payment information for payments made to BPB on the BPB Loan so Debtor could prepare its 2012 tax return and include interest payment information for payments made on the BPB Loan. Debtor had not received a 1098 or similar form from BPB with this information so Debtor requested a payment history from BPB.

22. On or about February 4, 2013 Debtor received a facsimile from BPB, addressed to me, consisting of a payment history on the BPB Loan. This fax was received and reviewed by me

at or about the time it was received and was dated and immediately placed in Debtor's files, books, and records in the normal course of business. The payment history reflected a payment history for 12/27/11 through 12/31/12, a principal balance of $3,460,916.67, regular monthly payments of $24,307.45, but an allocation of the payments only to interest and at 8.5% interest. A true and correct copy of this fax is attached hereto as Debtor's Trial Exhibit T. This fax was preceded by an email addressed to me from BPB and indicating "Bruce is out of the office today and per your voice mail has asked me to forward a payment history to you. I will prepare and sent to you later today by fax". See Debtor's Trial Exhibit BBB.

23.  The 8.5% interest rate and the allocation of the entire regular monthly payments of $24,307.45 to interest listed in the payment history on the BPB Loan did not appear correct. Therefore, I brought the matter to the attention of Andrew Lewis.

24.  Thereafter, on or about February 25, 2013 Bruce Brown emailed a revised payment history to me which referenced the BPB Loan, the payment history from July 19, 2011 through February 15, 2013, the interest rate at 6.5%, the regular monthly payment of $24,307.45, the application of the regular monthly payment to principal and interest at 6.5%, a declining principal balance, and a principal balance of $3,347,194.03. A true and correct copy of this fax is attached hereto as Debtor's Trial Exhibit U. The information contained in this revised payment history was consistent with Debtor's files, books, and records regarding the amounts paid to BPB on the BPB Loan, including the amount of interest paid to BPB on the BPB during 2012 and the outstanding principal balance of the BPB Loan. The email and revised payment history were received and reviewed by IGL, Debtor, and me at or about the time it was received and was dated and immediately placed in Debtor's files, books, and records in the normal course of business.

25.  Thereafter, I prepared and signed as the preparer Debtor's 2012 U.S. Return of Partnership Income dated February 28, 2013 and therein relied, in part, on the files, books, and records of IGL and Debtor and on the revised payment history from BPB to complete the tax return, specifically, Line 9 of Form 8825 entitled Rental Real Estate Income and

Expenses of Partnership or an S Corporation ("Form 8825") which asks for interest paid during the tax year. The tax return includes Schedule K-1 (Form 1065) which were sent to the Investors for their personal tax purposes, the Schedule K-1 includes profit and loss information from the tax return, and profit and loss was determined, in part, based on the amount of interest paid to BPB during the tax year.

26. Debtor did not make the March 2013 regular monthly payment to BPB pursuant to an agreement between Debtor and BPB as negotiated by Andrew Lewis and Bruce Brown of BPB. Debtor did not make regular monthly payments to BPB after May 2013 pursuant to an agreement between Debtor and BPB as negotiated by Andrew Lewis and Bruce Brown of BPB and BPB's subsequent demand that the tenant on the Property pay rent directly to BPB.

27. On June 27, 2013, Debtor commenced this Chapter 11 bankruptcy case ("Bankruptcy Case").

28. I assisted Debtor prepare its various bankruptcy schedules pursuant to on my duties and responsibilities with IGL and for Debtor and based on the files, books, and records of IGL and Debtor although the final approval of these schedules was Andrew Lewis' responsibility. Based on this information Debtor' Schedule D (Debtor's Trial Exhibit CC) listed the outstanding balance owed to BPB pursuant to the First DOT at $3,360,000.00, Debtor's July 2013 Monthly Operating Report (Debtor's Trial Exhibit DD) listed the outstanding balance owed to BPB pursuant to the First DOT at $3,360,000.00 (this total excludes the estimated secured property taxes owing of $210,000.00), and Debtor's Amended Schedule D (Debtor's Trial Exhibit EE) listed the outstanding balance owed to BPB pursuant to the First DOT at $3,360,000.00. True and correct copies of Debtor's Trial Exhibits CC, DD, and EE are attached hereto and said documents were prepared by me from information contained within IGL's and Debtor's files, books, and records.

29. In July 2013 Debtor and I, based on IGL's and Debtor's files, books, and records, prepared and provided the United States Trustee with a Balance Sheet as of June 27, 2013 which listed the outstanding balance owed to BPB pursuant to the First DOT at

$3,359,448.01. A true and correct copy of Debtor's Balance Sheet as of June 27, 2013 is attached hereto as Debtor's Trial Exhibit FF.

30. In July 2013 Debtor and I, based on Debtor's files, books, and records, prepared and provided the United States Trustee with a Profit & Loss statement for January 1, 2013 through June 27, 2013 which listed the interest paid or payable to BPB on the BPB Loan at $72,922.35 for the five months of 2013. The interest figure was based on Debtor's files, books, and records, including the revised payment history, regular monthly payments of $24,307.45, a 6.5% rate, and the information BPB provided to IGL and Debtor. A true and correct copy of Debtor's Profit & Loss statement is attached hereto as Debtor's Trial Exhibit GG.

31. In February 2013 Debtor and I, based on Debtor's files, books, and records, prepared a Balance Sheet as of December 31, 2012. The Balance Sheet and listed the outstanding balance owed to BPB pursuant to the First DOT at $3,359,448.01 and was based on Debtor's files, books, and records, including the revised payment history, regular monthly payments of $24,307.45, a 6.5% rate, and the information BPB provided to IGL and Debtor. A true and correct copy of the Debtor's Balance Sheet as of December 31, 2012 is attached hereto as Debtor's Trial Exhibit XX.

32. In February 2013 Debtor and I, based on Debtor's files, books, and records, prepared a Profit & Loss statement for 2012. A true and correct copy of the Debtor's Profit & Loss statement for 2012 is attached hereto as Debtor's Trial Exhibit YY. The statement listed the amount of interest paid to BPB on the BPB Loan at $214,528.19 and was based on Debtor's files, books, and records, including the revised payment history, regular monthly payments of $24,307.45, a 6.5% rate, and the information BPB provided IGL and Debtor.

33. Neither IGL's nor Debtor's files, books, or records include a notice of acceleration of the BPB Loan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Los Altos, California, on May 6, 2014.

/s/ Thomas Rancatore
Thomas Rancatore