1  CAMPEAU GOODSELL SMITH, L.C.
   SCOTT L. GOODSELL, #122223
2  WILLIAM J. HEALY, #146158
   440 N. 1st Street, Suite 100
3  San Jose, California   95112
   Telephone:   (408) 295-9555
4  Facsimile:   (408) 295-6606

5  ATTORNEYS FOR Debtor

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11 In re:                          )    Case No. 13-53491
                                   )
12 272 E SANTA CLARA GROCERY, LLC, )    CHAPTER 11
                                   )
13                       Debtor.   )    **DECLARATION OF ANDREW A.**
                                   )    **LEWIS**
14                                 )
                                   )
15                                 )
                                   )
16                                 )
                                   )
17                                 )
   _____)
18

19 I, Andrew A. Lewis, do hereby declare:

20 1.    I am the manager of Debtor 272 E SANTA CLARA GROCERY, LLC ("Debtor") and the

21 court appointed responsible person for the Debtor. I am also the one of the Investors as that

   term is described below and the principal and president of Investment Grade Loans, Inc.

22 ("IGL") as referenced hereinafter.  I am, and at all times herein referenced herein was, over

23 the age of eighteen. I am authorized to make this declaration on behalf of IGL and Debtor.

24 2.    I submit this declaration as part of Debtor's AMENDED OBJECTION TO PROOF

25 OF CLAIM OF BOSTON PRIVATE BANK & TRUST COMPANY (Claim No. 2)

26 ("Objection") and of my own personal knowledge and such personal knowledge is based on

27 my personal involvement in a loan to Kimomex Santa Clara, LLC ("Kimomex") by various

28

---

investors of IGL and brokered and serviced by IGL, foreclosure of the associated deed of trust with Kimomex relative to real property commonly known as 272 E. Santa Clara Street, San Jose, California ("the Property"), IGL's and Debtor's transactions and dealings with Boston Private Bank & Trust Company, formerly Borel Bank & Trust Company ("BPB") relative to BPB's loan and deed of trust to Kimomex relative to the Property, BPB's notice of default and notice of trustee's sale relative to BPB's loan and deed of trust to Kimomex relative to the Property, payments to BPB relative to BPB's loan to Kimomex, the foreclosure by IGL of the deed of trust associated with the Property, creation of Debtor, transfer of interests in the Property from IGL's investors to Debtor, Debtor's efforts to secure a tenant for the Property, Debtor's efforts to sell The Property, the bankruptcy of Debtor, the sale of the Property, and Debtor's tax returns. In this regard, I was and am readily familiar with process by which IGL and Debtor maintained its files, books, and records, with IGL's and Debtor's files, books, and records and IGL's files, books and records as they relate to each of the above-listed areas, know the documents attached hereto were placed into the files, books, and records of IGL and Debtor at or near the time they were received or generated, and became part of the files, books, and records IGL and Debtor consistent with the regularly business activities of IGL and Debtor.

3.     Only true and correct copies of the referenced exhibits are attached hereto. Except as noted herein the referenced exhibits are from IGL's and Debtor's files, books, and records. I understand the attached exhibits are also listed exhibits in Debtor's Trial Exhibit List and therefore this declaration references and uses those exhibit letters/numbers.

4.     IGL's business was and is, as its name indicates, providing investors with investment grade loans. My general duties at IGL include, but are not limited to, handling and/or overseeing all aspects of the business including loan originations, overseeing accounting, executing operating agreements for new business deals, approving loan documents including promissory notes, deeds of trust, and related documents, approving lender documents for IGL's investors, including disclosures, loan servicing, and tax returns for IGL and entities used for various business deals. I also communicate with IGL's borrowers and IGL's

Case: 13-53491     Doc# 180     Filed: 05/08/14     Entered: 05/08/14 15:34:31     Page 2 of 22

investors. My duties at IGL included various similar actions on behalf of the Debtor and included working with IGL's former Chief Financial Officer Thomas Rancatore with various bankruptcy filings and other matters. During my employment at IGL and relative to work for the Debtor, Thomas Rancatore and other employees of IGL generally reported to, took direction from, and assisted me.

5.     In May 2009, several investors (collectively the "Investors") loaned $635,000 to Kimomex Santa Clara, LLC ("Kimomex") secured by a deed of trust in second position ("Second DOT") against the Property with Investment Grade Loans, Inc. ("IGL") as trustee. The Second DOT was subject to an existing first deed of trust in the amount of approximately $3.6 million dollars recorded in July 2008 in favor of Boston Private Bank & Trust Company ("BPB") (formerly known as Borel Private Bank & Trust Company) (the "First DOT"). The Property consisted of 1.4 acres improved with a commercial building of approximately 26,575 square feet originally built in 1966 which was occupied by tenant Kimomex Markets, Inc. which operated a Mexican grocery store business.

6.     In approximately May 2009 and prior to execution of the IGL Note and Second Deed of Trust IGL prepared an Investment Overview for IGL's analysis and for the Investor's benefit based on information provided to and made available to IGL. I approved and signed the Investment Overview because at the time I believed that the information contained therein was true and accurate. As I recall the information contained therein came from several sources, including one of the principals of Kimomex, an appraisal of the property as indicated therein, and my own investigation. I do not believe that at that time IGL had a copy of BPB's Loan or the First DOT or that those documents were a source of the information contained in the Investment Overview. The Investment Overview notes certain information which IGL and the Investors may consider before proceeding with the business opportunity, including our understanding of the prior encumbrance. The Investment Overview notes, under "Prior Encumbrances" that Kimomex's monthly payment to BPB under BPB's loan to Kimomex and First DOT was $24,307.00, the interest rate was 6.5%, the present balance was $3,555,168.55. The "Equity Analysis",  Disclosure Statement

Summary, Part 9 Encumbrance Information, and Part 10 Loan to Value Ratio sections of the Investment Overview also note the present balanced owed by Kimomex to BPB was $3,555,168.55). See Debtor's Trial Exhibit A.

8.     The Mexican grocery store business failed and Kimomex entered into protracted negotiations with a potential new grocery store tenant, i.e. Fresh & Easy, but that deal was never consummated.

9.     In approximately June 2011 IGL recorded a notice of default under the Second DOT because Kimomex defaulted on the IGL Note.

10.    In approximately June 2011, IGL received a copy of a Notice of Trustee's Sale whereby BPB, through its trustee  Lender Services, Inc. (PLM Lender") gave notice of its intent to foreclose on the First DOT. The Notice of Trustee's Sale is dated June 23, 2011 and provides that the unpaid balance and other charges was estimated at $3,868,163.06. See Debtor's Trial Exhibit C.

11.    On June 30, 2011, prior to the Foreclosure Agreement described below, IGL was provided a reinstatement letter dated June 29, 2011 by PLM Lender Services, Inc. ("PLM"), trustee of the First DOT, which indicated, in part, the amounts necessary to reinstate the loan through July 15, 2011 at $386,080.68 (delinquent payments of $340,304.30 and miscellaneous fees) and specified a principal balance of $3,487,501.16. See Debtor's Trial Exhibit D.

12.    I negotiated the reinstatement and cure amount of $380,661.90 directly with Bruce Brown of BPB and based those negotiations on many factors, including the asserted principal balance of $3,487,501.16, that the regular monthly was $24,307.45, that the regular monthly payment consisted of principal and interest at 6.5%, that the regular monthly payment of $24,307.45 would keep the loan current, and without knowledge of any environmental issues with the Property. IGL would not have foreclosed on its Second DOT, entered into the Foreclosure Agreement on behalf of IGL, paid the agreed reinstatement and cure monies of $380,661.90 or paid the regular monthly payments of $24,307.45 to keep the loan current had the principal balance not been $3,487,501.16, had the payment of $380,661.90 and the

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 4 of
22

regular monthly payment of $24,307.45 not reinstated, cured, and kept the loan current, had the regular monthly payments of $24,307.45 not been based on interest at 6.5% and been applied to both principal and interest, had I been advised by BPB of the environmental issues with the Property, and had I been advised by BPB that it may attempt to assert any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs.

13.     On July 13, 2011 I wrote correspondence to the Investors to update them in the status of their investment and to request additional monies to fund related expenditures. See Debtor's Trial Exhibit E. At the time I signed this July 13, 2011 correspondence I believed, based on my communications with Bruce Brown of BPB, the figures in PLM's Notice of Trustee's Sale, and the figures listed in PLM's reinstatement letter, that BPB was owed $3,487,000.00 plus $386,00 as a reinstatement amount.

14.     On July 15, 2011, prior to the sale date, BPB and IGL entered into an "Agreement Re Foreclosure Sale" (the "Foreclosure Agreement"). See Debtor's Trial Exhibit F. I negotiated the reinstatement and cure amount of $380,661.90 directly with Bruce Brown of BPB. Under the Foreclosure Agreement BPB agreed that if IGL immediately paid $380,661.90 to cure the arrearage BPB would postpone the trustee's sale to after August 17, 2011, and that if IGL made "the regular monthly payment of $24,307.45 due under the Loan" to keep the loan current, then BPB would continuously postpone the trustee's sale through March 16, 2012. The Foreclosure Agreement also provided that the $380,661.90 sum shall be applied to payments of principal and interest now due, together with certain trustee's fees, attorneys' fees and other costs owing to Borel as of the date of this Agreement . . .". The Foreclosure Agreement acknowledges the Second DOT and at all times related to the Foreclosure Agreement and thereafter BPB was aware of the Second DOT.

15.     On July 18, 2001, pursuant to the Foreclosure Agreement, IGL paid BPB $380,661.90 to reinstate and bring the loan current.

16.     The foreclosure sale on the Second DOT took place on October 24, 2011. At the sale the Investors bid $100,000, which was the highest bid, and became the owners of the

Property. The sale resulted in a deficiency balance due on the IGL Loan of $1,083,908.74. On October 27, 2011 I signed on behalf of IGL as trustee a Trustee's Deed. BPB was promptly made aware of the foreclosure on the Second DOT. The Trustee's Deed was recorded with the Santa Clara County Recorder on April 20, 2012 as Document#21633290). See Debtor's Trial Exhibit J.

17.   At the time of the foreclosure, the building was empty, there was no tenant, and there was no rental income. On October 24, 2011 I wrote correspondence to the Investors to update them in the status of their investment. See Debtor's Trial Exhibit I.  At the time I signed this October 24, 2011 correspondence IGL and Debtor would not have foreclosed on its Second DOT, entered into the Foreclosure Agreement or subsequent amendments, paid the agreed reinstatement and cure monies of $380,661.90 to bring the loan current, or paid the regular monthly payments of $24,307.45 to keep the loan current had the principal balance not been $3,487,501.16, had the payment of $380,661.90 and the regular monthly payment of $24,307.45 not cured, reinstated, and kept the loan current, had the regular monthly payments of $24,307.45 not been based on interest at 6.5% and been applied to both principal and interest, had I been advised by BPB of the environmental issues with the Property, and had I been advised by BPB that it may attempt to assert any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs.

18.   Between October 2011 and March 2012, the Investors marketed the Property for lease to potential tenants, found a tenant in March 2012, and eventually paid $242,000 in leasing commissions. At the same time IGL was paying BPB its regularly monthly payment of $24,307.45 per month to keep the loan current.

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 6 of 22

19.   In January 2012, IGL and BPB entered into a "Second Amendment to Agreement Re Foreclosure Sale" (the "Second Amendment"). See Debtor's Trial Exhibit K. I recall there was a First Amendment Re Foreclosure Sale, as such is referenced in other documents, but believe it may not have been fully signed. Under the Second Amendment the parties agreed that if IGL made "the regular monthly payments" for December 2011 through March 2012 of $24,307.45 to keep the loan current then BPB would postpone the foreclosure sale, and if the Investors wanted to pay off the First DOT, BPB would accept $3.25 million dollars, less the payments made for those months, in full satisfaction of the First DOT. The plan was to have the Property leased and sold by March 2012 in order to pay off the First DOT. I negotiated these amendments directly with Bruce Brown of BPB.

20.   In March 2012, the Investors formed 272 E Santa Clara Grocery, LLC ("Debtor") and by way of a Grant Deed deeded their respective ownership interests in the Property to the Debtor. The deed was recorded in April 2012. BPB was promptly made aware of the transfer of such interest to the Debtor (and such is reflected in the Fourth Amendment discussed hereinafter).

21.   On or about March 8, 2012, Debtor, as landlord, entered into a 10-year lease for the Property with Grocery Outlet, Inc., a national grocery store chain. During the first few years the tenant pays rent of $39,600 per month. The monthly rent was net of all expenses, including property taxes, insurance, and maintenance (except the roof and structure) which are all paid by the tenant. See Debtor's Trial Exhibit M and P.

22.   In March 2012, BPB, IGL, and Debtor entered into a "Third Amendment to Agreement Re Foreclosure Sale" (the "Third Amendment"). See Debtor's Trial Exhibit N. I negotiated the Third Amendment with Bruce Brown on behalf of BPB. Under the Third Amendment, the parties agreed that if BPB was paid "the regular monthly payment of $24,307.45 due under the Loan" to keep the loan current then BPB would postpone the trustee's sale through December 31, 2012.

23.   The Third Amendment provides, in pertinent part, as follows:

"Recital C. As of the date of this Third Amendment, the principal sum due under

the Loan is $3,460,917.00."

"1. Acknowledgment of Recitals. The Parties acknowledge the truth and accuracy of the Recitals to this Third Amendment."

25.   At the time I executed the Third Amendment the principal figure of $3,460,917.00 appeared consistent with the information available to IGL, Debtor, and me, my communications with Bruce Brown of BPB, PLM's Notice of Trustee's Sale, amortization of the BPB Loan at 6.5%, and proper allocation of the prior payments to interest and principal.

26.   The Third Amendment also provided that Debtor and BPB would enter into a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") under which BPB would not disturb the tenant's possession in the event BPB foreclosed, which SNDA was signed on July 26, 2012. See Debtor's Trial Exhibit S.

27.   In reliance upon the multiple agreements with BPB, Debtor continued to pay BPB $24,307.45 per month through and including March 2013 to keep the loan current. Thus, from July 2011 through March 2013, Debtor paid Plaintiff $380,661.90 to cure the arrearage and bring the loan current, plus approximately $413,219 in monthly payments for a total of $793,880.90 to keep the loan current. This is in addition to the approximate $242,000 for leasing commissions spent to find a tenant. Thus, a total of approximately $1,035,880 was spent in reliance upon the agreements with BPB.

28.   IGL and Debtor would not have foreclosed on its Second DOT, entered into the Foreclosure Agreement or subsequent amendments, paid the agreed reinstatement and cure monies of $380,661.90 to bring the loan current, or paid the regular monthly payments of $24,307.45 to keep the loan current had the principal balance not been $3,487,501.16, had the payment of $380,661.90 and the regular monthly payment of $24,307.45 not cured, reinstated, and kept the loan current, had the regular monthly payments of $24,307.45 not been based on interest at 6.5% and been applied to both principal and interest, had I been advised by BPB of the environmental issues with the Property, and had I been advised by BPB that it may attempt to assert any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs.

29.   In November 2012, Debtor found a buyer and entered into a contract for the sale of the Property for $7.3 million dollars. The escrow was scheduled to close in December 2012. This sale would have paid off BPB's lien. However, during their due diligence, the buyer discovered that the Property was listed with the State and/or County as undergoing clean-up or investigation due to a possible leak from an old underground storage tank. Specifically, while conducting a Phase I, Environmental Investigation, the buyer discovered the existence of prior reports filed showing that the Property was contaminated. As a result of the discovery, the buyer cancelled the sale.

30.   This discovery by the buyer was the first notice that Debtor had of any contamination on the Property. However, Debtor was informed that BPB had been aware of the contamination since 2008, had a copy of a report showing purported contamination, and never disclosed the report or the purported contamination to Debtor. Had BPB disclosed this information to Debtor, Debtor would not have paid BPB $793,880 to cure the default, made the regular monthly payments under the First DOT to keep the loan current, or invested

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 9 of 22

another $242,000 in leasing commissions to find a tenant. In addition, had BPB disclosed this information, not affirmatively acknowledged the declining principal ($3,460,917.00 in the Third Agreement), not reinstated or treated the loan as current, not based the regular monthly payment of $24,307.45 on 6.5% and applied such payments to interest and principal, or asserted any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs then IGL and Debtor would not have entered into the Foreclosure Agreement or taken any of the actions described herein.

31.   In late January or early February 2013 and at my direction my staff contacted BPB because Debtor needed payment information for its tax returns and had not received a 1098 or similar form from BPB. On February 4, 2013 Debtor received a facsimile from BPB consisting of a payment history on the loan. The payment history reflects a payment history for 12/27/11 through 12/31/12, a principal balance of $3,460,916.67, regular monthly payments of $24,307.45, but an allocation of the payment only to interest and at 8%. See Debtor's Trial Exhibit T.

32.   I discussed the errors in this payment history with Tom Rancatore. Therefore, I contacted Bruce Brown of BPB, indicated that the payment history was incorrect in terms of the interest rate and application of the regular monthly payment to interest and principal, and asked that the errors be corrected immediately and made consistent with our agreement that the loan was brought current and kept current by the prior payments so Debtor could prepare its tax returns. Mr. Brown agreed to correct the errors.

33.   On February 25, 2013 Bruce Brown emailed an adjusted amortization schedule which referenced the loan, the payment history from July 19, 2011 through February 15, 2013, the interest rate at 6.5%, the regular monthly payment of $24,307.45, the application of the regular monthly payment to principal and interest at 6.5%, a declining principal balance, and a principal balance of $3,347,194.03.  See Debtor's Trial Exhibit U. I reviewed this document with Mr. Rancatore at or about the time it was received from BPB. The email and revised payment history were received and reviewed by IGL, Debtor, and me at or about the time it was received and was dated and immediately placed in Debtor's files, books, and

Case: 13-53491   Doc# 180   Filed: 05/08/14   Entered: 05/08/14 15:34:31   Page 10 of
22

records in the normal course of business.

34.    No further action was required because the revised payment history was consistent with Debtor's files, books, and records regarding the amounts paid to BPB on the BPB Loan, including the amount of interest paid to BPB on the BPB during 2012 and the outstanding principal balance of the BPB Loan; consistent with the information available to IGL, Debtor, and me; consistent with my communications with Bruce Brown of BPB; consistent with PLM's Notice of Trustee's Sale; consistent with the stated principal amount owing as listed in the Third Amendment; and amortization of the BPB Loan at 6.5% with allocation of the prior payments to interest and principal.

35.    The revised payment history (Debtor's Trial Exhibit U) appears to track the amounts owing relative to the payments made after the July 2011 payment of $380,661.90 and between July 15, 2011 and February 15, 2013, as represented in the PLM's reinstatement letter (Debtor's Exhibit D), as represented in the Notice of Trustee's Sale (Debtor's Trial Exhibit C), as represented and agreed in the Third Amendment (Debtor's Trial Exhibit N), and amortization of the BPB Loan at 6.5% with allocation of the prior payments to interest and principal.

36.    Debtor secured this amortization schedule from BPB for its 2012 taxes, reasonably relied upon this information, and used this information for its 2012 tax return which was prepared by Mr. Rancatore and approved and signed by me. See Debtor's Trial Exhibit V.

37.    Debtor continued to make the monthly payments of $24,307.45 to BPB through March 2013 to keep the loan current. Around that time, BPB, IGL and Debtor negotiated the terms for a fourth amendment regarding the foreclosure sale. Under the terms as negotiated, Plaintiff agreed that so long as Debtor and IGL took certain steps to obtain a "closure and/or no further action letter" regarding the contamination from the required regulatory agency, and to the extent required, pay for any additional environmental investigation, testing, remediation and/or other work, kept BPB apprised of the progress, and obtained a "closure and/or no further action letter" resolving all environmental issues no later than April 30, 2014, then no monthly payments after March 2013 would be due, and the foreclosure sale

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 11 of 22

would be continued through April 30, 2014. I negotiated this amendments directly with Bruce Brown of BPB.

38. In reliance upon the agreement that no payments were due after March 2013, Debtor did not make payments pending the drafting and execution of the fourth amendment. The draft fourth amendment was not received until May 2013. Consistent with the negotiations, the draft fourth amendment stated that no payments would be due after March 2013. However, contrary to prior discussions, the proposed "Fourth Amendment to Agreement Re Foreclosure Sale" (the "Fourth Amendment"), required Debtor, IGL, and their predecessors to release BPB from any claims relating to the Property including any environmental issues. See Debtor's Trial Exhibit X.

39. As BPB had failed to disclose the environmental contamination to Debtor prior to and during its dealings and did not know the severity of the contamination and cost of remediation, Debtor refused to execute the Fourth Amendment.

40. The Fourth Amendment, prepared by BPB and presented to IGL, Debtor, and me for signature, indicated as follows:

> "Recital C. As of the date of this Fourth Amendment, the principal sum due under the Loan is $3,341,017.00

> "1. Acknowledgment of Recitals. The Parties acknowledge the truth and accuracy of the Recitals to this Fourth Amendment."

41. On April 9, 2013 I wrote correspondence to the Investors to update them in the status of their investment. See Debtor's Trial Exhibit W. At the time I signed this April 9, 2013 correspondence I believed that BPB was owed approximately $3,400,000.00 and BPB was being kept current by the regular monthly payments of $24,307.45 as indicated in the letter based on my communications with Bruce Brown of BPB, the figures in PLM's Notice of Trustee's Sale, the figures listed in PLM's reinstatement letter, the figure in the Third Amendment, the revised payment history (Debtor's Trial Exhibit U), the figure in the Fourth Amendment (Debtor's Trial Exhibit X), and amortization of the BPB Loan at 6.5% with allocation of the prior payments to interest and principal.

42. On or about May 17, 2013 BPB served a "Demand That You Pay Rent To A Party Other Than The Landlord" on the tenant. See Debtor's Trial Exhibit Y. Debtor received confirmation that the tenant would comply with the demand and pay all rents directly to BPB. In compliance with the demand and commencing June 2013, BPB received and continues to receive all the rent, i.e. $39,600, directly from the tenant (this rent was about $15,300 more than the regular monthly payment). Pre-petition Debtor tendered, and continued to tender, immediate payment of the total arrearage, thereby bringing and maintaining the loan current. BPB wrongfully rejected this tender.

43. On June 10, 2013, BPB filed a Verified Complaint For (1) Judicial Foreclosure; And (2) Specific Performance And Appointment of Receiver commencing a state court action against Kimomex and Debtor, Santa Clara County Superior Action No.: 1-13-CV-247961 ("State Court Action") and wherein BPB, under penalty of perjury, repeatedly asserted "As of June 10, 2013, there is due, owing and outstanding under the Promissory Note the principal amount of $3,341,017.20 . . ." (sic). See Debtor's Trial Exhibit Z. Although the State Court Action does not acknowledge the prior agreements and prior payments, it does not assert or quantify any claim for default interest. This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor and I reasonably relied upon this information. BPB also moved for appointment of a receiver in the State Court Action and in this regard file a Memorandum of Points and Authorities and the Declaration of David Scheiber both of which specifically state "As of June 10, 2013, the outstanding principal balance due and owing from Kimomex under the Promissory Note and other Loan Documents is $3,341,017.20". See Debtor's Trial Exhibits AA and BB respectively and Debtor's Trial Exhibit BB page 3, paragraph 8, lines 24-25.

44. On June 27, 2013, Debtor commenced this Chapter 11 bankruptcy case ("Bankruptcy Case"). The bankruptcy was filed to avoid the unnecessary and expensive appointment of a receiver, to prevent BPB's pending foreclosure, and protect Debtor's substantial investment and substantial equity.

45. With the assistance of Mr. Rancatore and at my direction Debtor prepared its various

bankruptcy schedules based on the files, books, and records of IGL and Debtor. Based on this information Debtor' Schedule D (Debtor's Trial Exhibit CC) listed the outstanding balance owed to BPB pursuant to the First DOT at $3,360,000.00, Debtor's July 2013 Monthly Operating Report (Debtor's Trial Exhibit DD) listed the outstanding balance owed to BPB pursuant to the First DOT at $3,360,000.00 (this total excludes the estimated secured property taxes owing of $210,000.00), and Debtor's Amended Schedule D (Debtor's Trial Exhibit EE) listed the outstanding balance owed to BPB pursuant to the First DOT at $3,360,000.00. See Debtor's Trial Exhibits CC, DD, and EE.

46.   With the assistance of Mr. Rancatore and at my direction and based on IGL's and Debtor's files, books, and records, Debtor prepared and provided the United States Trustee with a Balance Sheet as of June 27, 2013 which listed the outstanding balance owed to BPB pursuant to the First DOT at $3,359,448.01. See Debtor's Trial Exhibit FF.

47.   In July 2013 with the assistance of Mr. Rancatore and at my direction and based on Debtor's files, books, and records, prepared and provided the United States Trustee with a Profit & Loss statement for January 1, 2013 through June 27, 2013 which listed the interest paid or payable to BPB on the BPB Loan at $72,922.35 for the five months of 2013. The interest figure was based on Debtor's files, books, and records, including the revised payment history, regular monthly payments of $24,307.45, a 6.5% rate, and the information BPB provided to IGL and Debtor. See Debtor's Trial Exhibit GG.

48.   In February 2013 with the assistance of Mr. Rancatore and at my direction and based on Debtor's files, books, and records, Debtor prepared a Balance Sheet as of December 31, 2012. The Balance Sheet and listed the outstanding balance owed to BPB pursuant to the First DOT at $3,359,448.01 and was based on Debtor's files, books, and records, including the revised payment history, regular monthly payments of $24,307.45, a 6.5% rate, and the information BPB provided to IGL and Debtor. See Debtor's Trial Exhibit XX.

49.   In February 2013 with the assistance of Mr. Rancatore and at my direction and based on Debtor's files, books, and records, Debtor prepared a Profit & Loss statement for

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 14 of
22

2012. The statement listed the amount of interest paid to BPB on the BPB Loan at $214,528.19 and was based on Debtor's files, books, and records, including the revised payment history, regular monthly payments of $24,307.45, a 6.5% rate, and the information BPB provided to IGL and Debtor. See Debtor's Trial Exhibit YY.

50.    On September 24, 2013, Debtor filed a disclosure statement and plan with a hearing date of November 7, 2013 (Doc#62).  On October 7, 2013, the court issued an Order Denying Motion for Order Confirming No Stay with Respect to Rent and Denying Cross-Motion for Use of Cash Collateral (Doc#64).

51.    On October 7, 2013, this court issued an Order Denying Motion for Order Confirming No Stay with Respect to Rent and Denying Cross-Motion for Use of Cash Collateral ("Order")(Doc#64) which, in summary confirmed Debtor's position that the post-petition rental income was property of the estate pursuant to Bankruptcy Code 541 and cash collateral of BPB and may not be used by Debtor absent consent of BPB or order of the court.

52.    Through counsel and at my direction Debtor attempted to secure an agreement with BPB regarding the use of cash collateral, prior to and after this court's Order, but BPB refused to consent[1] to Debtor using such funds to pay BPB its contractual interest and regular monthly payment of $24,307.45 for the post-petition months of July-October and thereafter as monthly rental income of $39,600 was received from Debtor's tenant, to pay United States Trustee Quarterly Fees as invoiced by the United States Trustee ("UST"), and to hold the balance of such funds in Debtor's DIP account pending an agreement with BPB and/or an order from this court and without prejudice to the rights of BPB or Debtor. See Debtor's Trial Exhibit OO.

53. On July 12, 2013, BPB, through David Scheiber, Senior Vice President- Special Assets Department of BPB, filed a declaration, under penalty of perjury, and asserted that the outstanding balance due and owing by Debtor to BPB on the First DOT as of June 27, 2013 totaled $3,341,017.20. ("Scheiber Declaration")(Docket#22-2, entered July 12, 2013, page 3,

---

[1]BPB orally refused to consent to the use of such funds and then refused to consent to use of such funds in writing (twice).

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 15 of 22

paragraph 7). See Debtor's Trial Exhibit HH. Specifically, BPB asserted "As of June 27, 2013, the outstanding principal balance due and owing from Kimomex under the Promissory Note and other Loan Documents is $3,341,017.20." This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor and I reasonably relied upon this information.

54.   On July 30, 2013 BPB filed a Reply in Support of its Ex Parte Applications for Orders of Examination and for Production of Documents Pursuant to Bankruptcy Rule 2004, in support of numerous 2004 applications (Docket#31-36 and 41) asserting "BPB holds the senior lien on the Property securing a loan with an outstanding principal balance of $3,341,017.20". (Docket#42, entered July 30, 2013, page 3, lines 7-8). See Debtor's Trial Exhibit II. At the same time BPB also re-filed the Scheiber Declaration to support the alleged principal balance of $3,341,017.20. (Docket#31-3, entered July 30, 2013, page 3, paragraph 7). See Debtor's Trial Exhibit JJ. This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor and I reasonably relied upon this information.

55.   On August 12, 2013 BPB filed an additional 2004 application and asserted "BPB holds the senior lien on the Property securing a loan with an outstanding principal balance of $3,341,017.20. (Counsel Decl. Exh. 1 ("Scheiber Declaration"), at ¶7.)" (Docket#45, page 2, paragraph 3). See Debtor's Trial Exhibit JJ. This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor and I reasonably relied upon this information.

56.   On August 14, 2013 BPB filed Secured Creditor Boston Private Bank & Trust Company's Opposition to Debtor's Cross Motion for Use of Cash Collateral and asserted "As of the Petition Date, the outstanding principal balance due and owing from Kimomex to BPB under the Note and other Loan Documents was $3,341,017.20." (Docket#50, page 4, lines 6-9). See Debtor's Trial Exhibit KK. This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor and I reasonably relied upon this information.

57.   On October 15, 2013 BPB filed a Declaration of Counsel In Support of Opposition to Ex Parte Application For Order Directing Boston Private Bank & Trust Company's Production of Documents Under Bankruptcy Rule 2004 and asserted "BPB holds the senior lien on the certain leased real property located at 272 E. Santa Clara Street, San Jose, Ca. (the "Property") securing a loan with an outstanding principal balance of $3,341,017.20". (Docket#51, page 5, lines 3-5). See Debtor's Trial Exhibit LL. This principal figure appeared consistent with the information provided to us by BPB and the agreements with BPB and Debtor and I reasonably relied upon this information.

58.   BPB consistently provided Debtor with confirmation of the principal amount owed under the loan and First DOT and how much it would cost to bring and keep the loan current and Debtor and I reasonably relied upon this representations. Debtor would not have pursued foreclosure of its Second DOT, the various agreements with BPB, secured a tenant, or paid BPB and various related expenses totaling approximately $1,035,880 ($380,661.90 to BPB to cure and reinstate the loan, $242,000 in leasing commissions, and $413,219 to BPB ($24,307.45 from July 2011-March 2013) for regular monthly payments of principal and interest to keep the loan current if the principal, interest, and interest rate were not as agreed with BPB or as represented by BPB. Debtor rightfully relied upon BPB's representations of principal, interest, and interest rate as discussed herein and as reflected in the Notice of Trustee's Sale, the June 2011 reinstatement letter (principal $3,487,501.16), in the March 2012 BPB Third Amendment (principal $3,460,917.00), its February 2013 Amortization Schedule (principal $3,347,194.03), in the May 2013 Fourth Amendment (principal $3,341,017.00), and various other documents.

59.   Yet, just as Debtor proceeded to sell the Property BPB filed the BPB Claim and asserted, contrary to all prior declarations and documents, that "As of the petition date, the outstanding principal due and owing from Kimomex under the Promissory Note and other Loan Documents is $3,555,168.55" (Proof of Claim No. 2, page 5). Suddenly, as Debtor moves to sell the Property, a $214,151.35 ($3,555,168.55-$3,341,017.00) difference in the claimed principal arises and said difference is reflected between BPB's agreements with

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 17 of
22

Debtor, documents BPB provided Debtor, the Verified Complaint in the State Court Action, and repeatedly filed declarations and representations made in this bankruptcy case on the one hand and the BPB Claim on the other hand.

60.     The BPB Claim asserts a demand for $3,806,600.52 as of October 15, 2013 and falsely asserts such demand consists of claims for $3,555,168.55 in principal, default interest of $217,401.61, late fees of $34,030.36, and attorney's fees and costs. The demand is wrong. Debtor does not owe the inflated principal of amount of $214,151.30 ($3,555,168.55-$3,341,017.20). Debtor does not owe interest except as indicated below. Debtor does not owe default interest of any kind. Debtor does not owe late fees of any kind. Debtor does not owe attorney's fees. The demand is falsely premised on BPB's unilateral reversing a payment of $380,661 made in July 2011 to cure and reinstate the loan and payments of $413,219 ($24,307.45 from July 2011-March 2013) made to keep the loan current and then reapplying them but only after belatedly creating a default date of May 2009, reapplying them at a increased rate of 8.5% from 6.5%, reapplying them so the payments were not made against principal and interest, and reapplying them as it they were late. The demand is falsely premised on BPB's attempt to nullify all of these payments, reverse and reapply all 2 1/4 years of payments based on a backdated default date of May 2009, backdate the interest rate from 6.5 % to the default rate of 8.5%, charge late fees to the backdated payments notwithstanding no payments were ever late, and do so without notice to Debtor. In addition, the demand unilaterally ignores BPB's agreement not to require payments in April 2013 and May 2013, ignores BPB's refusal to accept payments of $24,307.45 (principal and interest) from July 2013-October 2013 when BPB intercepted the rent payments from Debtor's tenant, and ignore Debtor's payment of $3,341,017.20 on November 8, 2013.

The demand is fatally flawed and inconsistent with the representations of Bruce Brown of BPB that we needed to pay $380,661 in July 2011 to cure the loan and $24,307.45 to keep the loan current, inconsistent with the agreement negotiated with Bruce Brown of BPB, the agreements with BPB, and BPB's repeated, sworn, and represented statements of the amount owed.

As of March 2013 the loan was current and a total of $3,341,017.20 was owed, without outstanding interest, default interest, late fees, or attorney's fees. Debtor paid the $3,341,017.20 in principal on November 8, 2013. As of November 8, 2013 the only possible outstanding interest owed on the BPB Loan was interest for the months of June 2013-October 2013 because BPB intercepted the rent payments from Debtor's tenant (all $39,600 and not just the $24,307.45). BPB refused Debtor's efforts to pay it $24,307.45 for the months of the months of June 2013-October 2013 which would have reduced the principal by approximately $6,143.54/month and paid interest of approximately $18,163.91/month (using amortization figures as of 2/15/14 in Debtor's Trial Exhibit U-the revised payment history from BPB). Therefore, Debtor estimates that BPB may be owed interest of no more than approximately $90,819.55 ($18,163.91 x 5 (June 2013-October 2013)). Had BPB accepted payments from Debtor or made that demand at escrow, it would have been paid as rent was received and/or at escrow. BPB would not have incurred any attorney's fees had it honored the representations of Bruce Brown, the agreement negotiated with Bruce Brown, the agreements with BPB, and BPB's repeated, sworn, and represented statements of the amount owed.

61.     On November 8, 2013 Debtor, pursuant to the court's October 30, 2013 Order Granting Motion to Sell Real Property (272 E. Santa Clara St.) Free and Clear of Liens and Pay Broker/agent (Docket#89) (See Debtor's Trial Exhibit RR), paid BPB $3,341,017.20 in principal (See Debtor's Trial Exhibits QQ and RR). BPB has not amended the BPB Claim to acknowledge such principal payment.

62.     The BPB Claim was, admittedly, backdated. Debtor rejects the explanation for the backdating as "based on a proper allocation of prior payments" as alleged therein. Debtor submits that BPB, in an effort to improperly maximize its recovery, backdated its calculations.

63.     BPB failed to put Debtor on notice of its intention to accelerate the note and seek default interest.  In fact, BPB did the opposite.

64.     BPB was aware of Debtor's junior deed of trust on the Property and did not assert any

objection relative thereto, negotiated and entered into various agreements with Debtor wherein BPB specified the amounts necessary to cure arrears and reinstate the loan and keep the loan current and accepted these payments from Debtor over the course of approximately two years without objection, was aware of Debtor's foreclosure on its junior deed of trust on the Property and did not assert any objection relative thereto, was aware of Debtor's efforts to ready the Property to secure a tenant and that it had secured a tenant and did not assert any objections relative thereto, was aware of Debtor's efforts to market and sell the Property and of its December 2012 sale and did not assert any objection relative thereto, continued to accept regular monthly payments from Debtor without objection or reservation, and at no time prior to the commencement of this case did BPB ever assert, mention, reference, or claim default interest.

65.    In reliance thereon, Debtor foreclosed on its junior deed of trust, paid substantial monies to BPB to cure its arrears and reinstate the loan, paid substantial monies to BPB to maintain its regular monthly contractual payment, paid substantial monies to others to ready the Property for a tenant and to secure a tenant, and marketed the Property for sale and secured a buyer-only to have the sale fall through due to BPB's non-disclosure of the environmental issue. Similarly, BPB consistently provided Debtor with confirmation of the declining principal amount owed under the loan and First DOT upon which Debtor reasonably relied. Debtor would not have pursued foreclosure of its Second DOT, the various agreements with BPB, secured a tenant, or paid BPB and various related expenses totaling approximately $1,035,880 ($380,661.90 to BPB to cure and reinstate, $242,000 in leasing commissions, and $413,219 to BPB ($24,307.45 from July 2011-March 2013) for regular monthly payments of principal and interest to keep the loan current if the principal was not as represented by BPB, the regular monthly payment of $24,307.45 was not being applied to principal and interest at 6.5%, or had I been advised by BPB that it may attempt to assert any right to thereafter backdate and/or re-apply the monies already paid to it against alleged late fees, interest at $8.5%, or other costs. Debtor rightfully and reasonably relied upon BPB's

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 20 of
22

representations of principal and interest including as reflected in its June 2011 reinstatement letter (principal $3,487,501.16), the March 2012 BPB Third Amendment (principal $3,460,917.00), its February 2013 Amortization Schedule (principal $3,347,194.03 and interest at 6.5%), and the March 2013 Fourth Amendment (principal $3,341,017.00).

66.     Debtor cured and reinstated the loan as agreed, kept the loan current, and all curable or other defaults were waived by BPB.

67.     The BPB Claim improperly asserts late fees notwithstanding Debtor reinstated the loan and cured BPB's claimed monetary defaults in approximately July 2011 and caused timely regular monthly payments to be made thereafter and through present to keep the loan current, including those payments intercepted by BPB from Debtor's tenant and/or that which BPB refused to accept. The BPB Claim asserts late fees of $1,215.37 a month from July 19, 2011 to October 15, 2013 and totaling $34,030.36 as of November 15, 2013. Yet, the same BPB Claim simultaneously asserts payments made from July 19, 2011 through March 15, 2013, fails to acknowledge a March 2013 agreement between BPB and Debtor that monthly payments need not be made, fails to acknowledge that pre-petition BPB received the June 2013 rent payment of $39,600 following BPB's May 17, 2013 BPB Demand That You Pay Rent To A Party Other Than The Landlord, and fails to acknowledge that post-petition BPB intercepted $39,600 for four consecutive months (July-October 2013) totaling $158,400 ($39,600 x 4) and then refused to accept regular monthly contract payments of $24,307.45 from Debtor for the months of July-October 2013 and thereafter as Debtor's tenant paid its monthly rent. Debtor filed a Motion for Use of Cash Collateral because BPB refused to accept such payments.

68.     BPB has no basis to charge Debtor late fees.  As stated hereinabove, Debtor reinstated the loan, cured the non-monetary defaults, and kept the loan current as agreed, BPB received overpayments from Debtor's tenant or simply refused to accept payments, and Debtor only stopped making payments pursuant to a verbal agreement with BPB that no payments needed to be made until the environmental issue relative to the Property could be resolved (as

Case: 13-53491    Doc# 180    Filed: 05/08/14    Entered: 05/08/14 15:34:31    Page 21 of
22

referenced in the Fourth Amendment Re Foreclosure Sale) and then BPB intercepted, kept, and should have applied the April, May, and June 2013 $39,600 each ($118,800) and then wrongfully intercepted, held without applying payments against the loan, belatedly turned over to Debtor rents for July-October 2013, but then refused to accept payments for July-October and thereafter from Debtor at $24,307.45 per month.

69.     In May 2013 I received correspondence from BPB which indicated, in part, "The relationship between the Bank, on the one hand, and Investment Grade Loans, Inc and 272 E. Santa Clara Grocery, LLC, on the other hand, remains governed by the provisions of the Third Amendment to Agreement Re Foreclosure Sale, which the parties executed in March 2012." See Debtor's Trial Exhibit WW.

70.     IGL, Debtor, and I were never asked to and never assumed the BPB Loan or First DOT.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Los Altos, California, on May 7, 2014.

/s/ Andrew A. Lewis
Andrew A. Lewis
